**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 5 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

———————————————

DON C. KENNARD and HARROLD
E. WRIGHT,

    Plaintiffs - Appellants,

v.

COMSTOCK RESOURCES, INC.;
COMSTOCK OIL & GAS, INC.;
BLACK STONE OIL CO.; W T
CARTER & BRO; and WILLOW
CREEK RESOURCES, INC.,

    Defendants - Appellees.

———————————————

UNITED STATES OF AMERICA and
BURLINGTON RESOURCES OIL &
GAS COMPANY LP,

    Amici Curiae.

No. 03-8012

———————————————

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 01-MD-1679)**

———————————————

Pat S. Holloway, Dripping Springs, Texas, for Plaintiffs-Appellants.

J. Robert Beatty (W. Scott Hastings with him on the brief) of Locke, Liddell &
Sapp LLP, Dallas, Texas, for Defendants-Appellees.

Sara McLean, Attorney, Civil Division, Washington, D.C. (Robert D. McCallum,

Jr., Assistant Attorney General; Douglas N. Letter, Appellate Litigation Counsel; Alan E. Kleinburd and Michael D. Granston, Attorneys, Civil Division, Washington, D.C., with her on the brief), for Amicus Curiae United States.

John T. Boese, Justin J. Brookman, and Michael J. Anstett of Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C.; Donald I. Schultz, P.C., of Holland & Hart, LLP, Cheyenne, Wyoming; Craig L. Stahl and Jeffrey T. Kuehnle of Andrews & Kurth LLP, The Woodlands, Texas; and Laura B. Rowe of Hicks, Thomas & Lilienstern, LLP, Houston, Texas, filed a brief for Amicus Curiae Burlington Resources Oil & Gas Co. LP.

---

Before **EBEL**, **McKAY**, and **LUCERO**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

Appellant Relators Mr. Kennard and Mr. Wright brought this *qui tam* action on behalf of the United States Government against Appellees Comstock Resources, Inc., *et al.*, ("Comstock") pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3730 ("FCA"). The allegations center around oil and gas leases between Comstock and an Indian Tribe. The Indian leases are subject to regulation by the Secretary of the Interior who acts as a fiduciary for the Tribe. Comstock pays royalties owed to the Tribe to the Mineral Management Service ("MMS"), an agency under the Secretary. The MMS is responsible for (1) collecting royalties, (2) ensuring the accuracy of those payments with audits, and (3) remitting the royalty payments to the Tribe.

-2-

Relator Wright owned royalty interests in a tract of land near the Indian Tribe's Reservation and had been receiving royalty payments for gas wells located on the property for over twenty-five years. When the operator on Mr. Wright's property sold its lease interests to Comstock, Mr. Wright's royalty payments dropped dramatically. Based on this dramatic drop, Mr. Wright speculated that Comstock was underpaying him and others in the area, including the Tribe.

Mr. Wright contacted Relator Kennard with his information. Relator Kennard researched and investigated public records and discovered that the Indian leases might have expired. Based on the investigation and Relators' extensive oil and gas experience, they concluded that Comstock was underpaying royalties to the Tribe and also that Comstock knew that it was underpaying the Tribe. After consultation with attorneys, Relators concluded that Comstock had committed fraud and violated the FCA. The attorneys, including Mr. Sydow, began drafting a complaint. Relators invited the Tribe to join the suit as co-Relators and the Tribe declined.

On October 21, 1998, Relators sent the required "Disclosure Statement" to the Government to which a yet-unfiled complaint was attached. On October 26, 1998, Mr. Sydow filed suit acting as the Tribe's attorney instead of as Relators' attorney. The following day, Relators filed this suit alleging essentially the same things as the Sydow Complaint. Relators allege that Mr. Sydow essentially stole

-3-

their information in preparing the Tribe's complaint.

The FCA imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7). Violators are "liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a). Pursuant to 31 U.S.C. § 3730, a private individual, known as a relator, "may bring a civil action for a violation of [31 U.S.C. § 3729] for the person and for the United States Government . . . in the name of the Government." 31 U.S.C. § 3730(b)(1). The relator then receives a share of any Government recovery. 31 U.S.C. § 3730(d). The relator's *qui tam* complaint is filed under seal and served on the Government with "a written disclosure of substantially all material evidence and information" in the relator's possession. 31 U.S.C. § 3730(b)(2). The Government may then either choose to intervene and take over litigation or decline to intervene, "in which case the person bringing the action shall have the right to conduct the action." 31 U.S.C. § 3730(b)(2), (4).

In the instant case, the district court dismissed Relators' FCA *qui tam* complaint for lack of subject matter jurisdiction pursuant to 31 U.S.C. § 3730(e)(4)(A) which provides:

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

On appeal, we are asked to decide whether the district court erred in dismissing Relators' complaint for lack of subject matter jurisdiction on grounds that (1) the current action was barred because of a prior public disclosure and (2) Relators did not qualify as an original source. We review *de novo* the district court's dismissal of Relators' FCA *qui tam* action for lack of subject matter jurisdiction. United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1518 (10th Cir. 1996) ("review of the district court's dismissal under the FCA jurisdictional bar is plenary" because "the jurisdictional question is necessarily intertwined with the merits.").

Application of the 31 U.S.C. § 3730(e)(4) jurisdictional bar requires a four-step inquiry:

(1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made "public" within the meaning of the False Claims Act; (3) whether the relator's complaint is "based upon" this public disclosure; and, if so, (4) whether the relator qualifies as an "original source."

United States ex rel. Hafter v. Spectrum Emergency Care, 190 F.3d 1156, 1161 (10th Cir. 1999) (quoting United States ex rel. Fine v. MK-Ferguson Co., 99 F.3d

1538, 1544 (10th Cir. 1996). "A court should address the first three public disclosure issues first. Consideration of the fourth, 'original source' issue is necessary only if the court answers the first three questions in the affirmative." Id. Therefore, we must first address whether the Sydow Complaint operated as a public disclosure which would operate to bar the current action unless Relators are an original source.

Relators argue strenuously that because Mr. Sydow allegedly unethically used their information in drafting his complaint for the Tribe that this court should not validate that fraud. However, we are constrained by the law as it is written. The jurisdictional bar in 31 U.S.C. § 3730(e)(4) does not contemplate an exception to public disclosure unless the person is an original source. The remedy for the alleged conversion of information in this case lies elsewhere. Section 3730(e)(4) operates to satisfy the dual goals of "avoidance of parasitism and encouragement of legitimate citizen enforcement actions." United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 651 (D.C. Cir. 1994). "Consistent with these purposes, we believe the threshold 'based upon' analysis is intended to be a quick trigger for the more exacting original source analysis." United States ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 552 (10th Cir. 1992). Once a public disclosure is made, even if by somewhat nefarious means, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).

-6-

In the instant case, the alleged public disclosure is the Sydow Complaint. Civil hearings are specifically referenced in 31 U.S.C. § 3730(e)(4)(A). Section 3730(e)(4) lists "[(1)] a criminal, civil, or administrative hearing, [(2)] a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, [or (3)] the news media" as sources available for public disclosure. We have repeatedly held that prior civil actions are public disclosures under the FCA. Precision, 971 F.2d at 553-54; see also United States ex rel. King v. Hillcrest Health Ctr., Inc., 264 F.3d 1271, 1279 (10th Cir. 2001); Hafter, 190 F.3d at 1161 n.6. Additionally, "every court of appeal to have addressed the question has held that any information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure . . . for purposes of section 3730(e)(4)(A)." Ramseyer, 90 F.3d at 1519 n.3 (quoting United States v. Northrop Corp., 59 F.3d 953, 966 (9th Cir. 1995)) (internal quotations omitted). The filing of the Sydow Complaint commenced a civil action on behalf of the Tribe against Comstock. Thus, the first of the threshold inquiries, whether the alleged public disclosure contains allegations or transactions from one of the listed sources, is satisfied.

We must next address whether the alleged disclosure has been made public within the meaning of the FCA. Relators argue that because the disclosure in this case was only made to a single Government filing clerk who stamped the Sydow Complaint, no public disclosure occurred. This argument is unpersuasive. Section

3730(e)(4) operates as a "quick trigger." Precision, 971 F.2d at 552. Once a complaint is filed, a civil action has commenced and public disclosure has occurred. There is no requirement that a certain number of people read or receive the information. Relators rely on United States ex rel. Holmes v. Consumers Ins. Group, 318 F.3d 1199, 1204-05 (10th Cir. 2003) (en banc), in which we held that the allegations "must have been made known to the public through some affirmative act of disclosure." However, disclosure to a single filing clerk was enough in the instant case because the filing of the civil action in itself was the affirmative act of disclosure. It is not necessary that the filing clerk or any member of the public read the complaint. Additionally, in Holmes we specifically held that a public disclosure can occur to a single person. 318 F.3d at 1206 n.5.

Relators' argument that providing a complaint to the Government in advance of filing immunizes a relator from the operation of the FCA's public disclosure bar is similarly misdirected. Section 3730(e)(4) does not contain an exception for complying with the mandatory jurisdictional requirements of § 3730(b)(2).[1]

---

[1]Section 3730(b)(2) provides:

> A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed

(continued...)

-8-

Additionally, disclosure to the Government through § 3730(b)(2) is not a public disclosure contemplated by § 3730(e)(4). As discussed above, § 3730(e)(4) specifically lists the following sources as avenues for public disclosure: [(1)] "a criminal, civil, or administrative hearing, [(2)] a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or [(3)] the news media." "[I]n order to be publicly disclosed, the allegations or transactions upon which a *qui tam* suit is based must have been made known *to the public* through some affirmative act of disclosure." Ramseyer, 90 F.3d at 1519 (emphasis added). This requirement clearly contemplates that the information be in the public domain in some capacity and the Government is not the equivalent of the public domain.

The first two inquiries being answered in the affirmative, we then ask whether Relators' complaint is based upon the public disclosure. "The test is whether 'substantial identity' exists between the publicly disclosed allegations and the *qui tam* complaint." MK-Ferguson, 99 F.3d at 1546 (10th Cir. 1996) (quoting Precision, 971 F.2d at 553-54). Relators have conceded that the complaints at

_____

[1](...continued)
> with the action within 60 days after it receives both the complaint and the material evidence and information.

Id.

-9-

issue are substantially similar.  See Aplt. Br. at 17.[2]  We find no merit in Relators'

argument that because the Sydow Complaint was allegedly based solely and

exclusively on Relators' information and complaint that it is impossible for

Relators' complaint to be based upon the Sydow Complaint.  "'Based upon,' in 31

U.S.C. § 3730(e)(4)(A), means 'supported by.'"  MK-Ferguson, 99 F.3d at 1545

(quoting Precision, 971 F.2d at 552).  Whether Relators' *qui tam* complaint was

already drafted when the Sydow Complaint was filed is irrelevant.  A relator need

not have learned of the basis for the *qui tam* action from the public disclosure for

its action to be considered based upon that public disclosure if the allegations are

substantially similar.  United States ex rel. Fine v. Advanced Sciences, Inc., 99

F.3d 1000, 1006 n.4 (10th Cir. 1996) (court rejected argument that because

relator's discovery of alleged fraud occurred prior to public disclosure, complaint

could not be based upon the later-occurring public disclosure); see also MK-

Ferguson, 99 F.3d at 1546.  Therefore, the first three steps of the 31 U.S.C. §

3730(e)(4) jurisdictional bar are satisfied and the Sydow Complaint operated as a

---

[2]       Relators certainly have no quarrel with the findings of
          the court below that [t]he factual situation giving rise to
          the allegations is identical in each complaint[, and] the
          language detailing the alleged fraud in each complaint
          only varies slightly.

Aplt. Br. at 17 (quoting Aplt. App., Vol. II, at 493) (internal quotations omitted).

-10-

public disclosure.[3]

Since we hold that the Sydow Complaint was a public disclosure, we must now address the fourth step – whether Relators were an original source. Section 3730(e)(4)(B) defines original source as "an individual that has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." See also United States ex rel. Stone v. Rockwell Int'l Corp., 282 F.3d 787, 802-03 (10th Cir. 2002). "Direct and independent knowledge is knowledge marked by the absence of an intervening agency . . . [and] unmediated by anything but the relator's own labor." Hafter, 190 F.3d at 1162 (internal quotations and citations omitted). The burden is on the relator to show that he is an original source. Stone, 282 F.3d at 800. To meet this burden, a relator must provide more than an "unsupported, conclusory allegation" to show that he is an original source. Id. (quoting Hafter, 190 F.3d at 1162).

Comstock argues that Relators were not an original source because: (1) Relators did not possess substantive information about the particular fraud, (2) they were not insiders of Comstock or the Tribe, and (3) they relied on public records. Thus, Comstock asserts that Relators merely conducted background

---

[3]There is no merit in Comstock's argument that disclosure of information to the Tribe was a former public disclosure. Disclosures of actions that, at the time, were not contained in any of the sources enumerated in 31 U.S.C. § 3730(e)(4)(A) are not public disclosures.

research and relied on their own expertise to speculate that Comstock had defrauded the Government. We will address each contention in turn.

Comstock's first assertion, that Relators did not possess information about the particular fraud, has no basis in Tenth Circuit precedent. Knowledge of the actual fraudulent conduct is not necessary. See Stone, 282 F.3d at 803. A relator "need only possess 'direct and independent knowledge of the *information on which the allegations are based*.'" Id. (quoting 31 U.S.C. § 3730(e)(4)(B)) (emphasis in original). A "relator need not . . . have in his possession knowledge of the actual fraudulent conduct itself; knowledge 'underlying or supporting' the fraud allegation is sufficient." Id. (quoting Hafter, 190 F.3d at 1162). Thus, the fact that Relators did not have knowledge of the actual alleged fraudulent submissions to the Government cannot disqualify them as an original source.

Comstock's second contention, that Relators were not insiders of either Comstock or the Tribe, is also without merit. Our review of the relevant case law revealed no requirement that a relator be a corporate insider. Additionally, we can think of no valid reason for creating such a restriction.

The third contention, that Relators relied on public records, deserves more attention. We have not and will not adopt any bright-line rule disqualifying a relator as an original source when the relator examines public records. However, the degree and character of such reliance is necessarily deserving of our attention.

A mere compilation of documents or reports already in the public domain will not allow a relator to qualify as an original source. However, a complete and thorough investigation of a fraud on the Government will likely necessarily involve some review of contracts, documents, or other information in the public domain. It is the character of the relator's discovery and investigation that controls this inquiry.

On one end of the spectrum, there are several cases that define an action based solely on the labor of others. In United States ex rel. Findley v. FPC-Boron Employees' Club, the Court of Appeals for the Federal Circuit held that "[a] relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation have already been publicly disclosed." 105 F.3d 675, 688 (D.C. Cir. 1997). The court further stated that "[i]f a relator merely uses his or her unique expertise or training to conclude that the material elements already in the public domain constitute a false claim, then a *qui tam* action cannot proceed." Id.; see also MK- Ferguson, 99 F.3d at 1548 (concluding plaintiff did not qualify as original source because his complaint merely tracked an audit report; he neither observed nor discovered the purported fraud); United States ex rel. Fine v. Sandia Corp., 70 F.3d 568, 572 (10th Cir. 1995) (public disclosure of material elements of fraud bars *qui tam* action even if disclosure itself does not allege wrongdoing because FCA does not require allegations to have statutory basis); United States ex

rel. Aflatooni v. Kitsap Physicians Serv., 163 F.3d 516, 526 (9th Cir. 1999) (relator who offered only speculation and conjecture that defendant committed alleged fraud did not qualify as original source).  Thus, when a relator's *qui tam* action is based solely on *material elements* already in the public domain, that relator is not an original source.

Similarly, in United States ex rel. Kreindler & Kreindler v. United Technologies Corp., the Second Circuit held that an attorney who participated in the initial litigation on which his *qui tam* action was based was not an original source.  985 F.2d 1148, 1159 (2d Cir. 1993).  The court stated that "[t]he fact that [the relator] conducted some collateral research and investigations[,] . . . as would be customary in such litigation, does not establish direct and independent knowledge of the information on which the allegations are based."  Id. (internal quotations omitted).  The court further explained:

> Nor does the fact that [the relator's] background knowledge enabled it to understand the significance of the information acquired . . . make its knowledge independent of the publicly disclosed information.  If that were enough to qualify the relator as an original source then a cryptographer who translated a ciphered document in a public court record would be an original source, an unlikely interpretation of the phrase.

Id. (internal quotations and citations omitted).

Our case is easily distinguished from both Findley and Kreindler.  Unlike the relator in Findley, Relators in our case did not merely attach a legal label to a

-14-

fraud already noticed in the public domain. While "relator Findley's complaint merely echoe[d] publicly disclosed, allegedly fraudulent transactions," id., Relators in our case conducted their own investigation and crafted their own claim of the fraud on the Government. Additionally, unlike the relator in Kreindler, Relators in our case cannot be compared to mere cryptographers who translated a document. Nor can they be compared to an attorney who took someone else's labor and investigation and gave it legal meaning. While some of the information discovered by Relators was in the public domain, Relators did not merely label or translate an already publicly disclosed fraud.

On the other end of the spectrum, our case parallels the court's statement in Springfield where "[the relator] started with innocuous public information [and] completed the equation with information independent of any preexisting public disclosure." 14 F.3d at 657. Relator Wright did not refer to, examine, or rely on any public records. He relied exclusively on his own personal, private royalty records and statements from Comstock and other oil companies. He noticed that when Comstock took over the lease on one of his properties, his royalty payments dropped dramatically. Relator Kennard did examine public records in the course of his independent investigation at the Railroad Commission of Texas and the Texas General Land Office to support the discovery of the alleged fraud. However, many investigations of fraud on the Government will necessarily involve

-15-

a review of the relevant and publicly available Government contracts out of which the fraud claim arises. Mr. Kennard did not merely compile statistics; he did his own research and investigation. He did not rely on a Government report dealing with the allegations and transactions on which the current *qui tam* action is based because no such document exists.

The district court concluded that "Relators have merely compiled public information and because of their education and background were able to speculate that [Comstock] underpaid [] royalties." Aplt. App. at 498. We disagree. In its determination, the district court relied heavily on the fact that Relators were not members of the Tribe or insiders of Comstock, a concern we deem irrelevant to the current inquiry. The district court further relied on the fact that Relators used documents already in the public domain during their investigation. However, in the instant case, Relators' claim did not derive from a third party's research and investigation. Relators discovered the alleged fraud and Relators conducted the investigation. Our concern discussed in Hafter of the necessity to "weed out parasitic plaintiffs who offer only secondhand information, speculation, background information or collateral research" is not implicated in this case. 190 F.3d at 1162-63. There must be some consideration to the availability of the information and the amount of labor and deduction required to construct the claim. Relators sorted through relatively obscure public documents and, together with

personal royalty records, used these documents to discover and support their claim of the alleged fraud. It is important to note that none of the public documents disclosed the alleged fraud. It was only through independent investigation, deduction, and effort that Relators discovered the alleged fraud. Relators "ha[d] direct and independent knowledge of the fraud allegedly committed [since they are] the [people] responsible for ferreting it out in the first place." Holmes, 318 F.3d at 1207. Relators were not just assemblers of information. This case would not exist but for Relators sniffing it out. Through discovery and deduction, Relators ferreted out the alleged fraud in this case and must, therefore, qualify as an original source.

Comstock also argues that Relators are factually incorrect in their claim of fraud on the Government. However, whether the "claim is ultimately flawed on the merits is an analytically distinct question from the one mandated by the FCA for establishing jurisdiction." Stone, 282 F.3d at 803. Thus, a "relator need only show that he possessed direct and independent knowledge of the information on which his claim is based, not that his claim is factually correct." Id.

We will briefly address Comstock's alternative argument that the FCA's *qui tam* provision does not authorize a relator to sue based upon losses allegedly suffered by an Indian Tribe. This argument is unsupported by the text of 31 U.S.C. § 3729(a)(7). "As in all cases involving statutory construction, our starting

-17-

point must be the language employed by Congress, . . . and we assume that the legislative purpose is expressed by the ordinary meaning of the words used." Holmes, 318 F.3d at 1208. Section 3729(a)(7)[4] provides that "a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money . . . to the Government" is actionable. Thus, the text broadly encompasses the fraud on

---

[4]Amicus Curiae Burlington Resources Oil & Gas Co.'s cites to cases involving § 3729(a)(1) are inapposite because the plain language of the statutes is distinctly different. Section 3729(a)(1) provides:

> Any person who . . . knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

Section 3729(a)(1) requires the existence of a "claim." Relying mostly on the word claim, some courts interpreting § 3729(a)(1) have held that this provision requires a showing of actual or potential loss to the Government. See, e.g., Hutchins v. Wilentz Goldman & Spitzer, 253 F.3d 176, 184 (3d Cir. 2001) (claims that do not result in economic loss to Government are not within scope of § 3729(a)(1)). Section 3729(a)(7), at issue in the instant case, does not encompass a similar restriction. Instead, it provides that:

> Any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or *transmit* money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

(emphasis added).

-18-

the Government that occurs when a person or entity makes a false statement to the Government in order to decrease an obligation to *transmit* money to the Government. The *transmission* of funds to the Government is enough; there is no requirement in the text that the Government have an ongoing interest in the funds or that the Government itself suffer a loss. Additionally, transmit is defined as "to cause to go or be conveyed to another person or place: SEND." Webster's Third New International Dictionary 2429 (1986). Neither the text of § 3729(a)(7) nor the definition of transmit encompasses a necessary beneficial interest in the funds or a requirement about how the funds are to be used or disbursed. Therefore, what the Government does with the royalties after they are deposited in the Treasury is of no consequence in the context of a *qui tam* suit.

Comstock's argument that the FCA does not authorize Relators to sue on behalf of the Tribe misstates the issue because a *qui tam* suit is on behalf of the Government, not the Tribe.[5] A *qui tam* suit is to recover penalties for false statements *to the Government*. Section 3730(b)(1) provides that a private person may bring an action "for the person and for the United States Government . . . in the name of the Government." The fraud is that which occurs when the person or entity makes a false statement to the Government. The fraud at issue is not that

---

[5]Additionally, Comstock's argument that 31 U.S.C. § 3730(e)(3) deprived the district court of jurisdiction over this suit on behalf of the Government is incorrect. Comstock can point to no earlier suit by the Government that would trigger the statutory bar. The Tribe is not the equivalent of the Government.

-19-

which occurs when the Indian Tribe receives less royalties than those which are due pursuant to the lease. While this suit relates to leases between Comstock and the Tribe, it is an action on behalf of Relators and the Government to redress an alleged fraud on the Government.

The mineral royalties at issue are paid to the Mineral Management Service of the United States Department of the Interior. Royalty payments due on Indian leases must be paid "in the time and manner as may be specified by the Secretary [of the Department of the Interior]." 30 U.S.C. § 1712(a). Royalties owed on Indian Tribe leases must be transmitted to "the MMS or such other party as may be designated." 25 C.F.R. § 211.40. Indian lessees like Comstock must report to the MMS the amount of royalties due when they submit their royalty payments. See 30 C.F.R. § 210.52; 30 U.S.C. § 1713(a). The royalties paid to the MMS on Indian leases are transferred from an MMS Treasury account to separate accounts in the Treasury and the royalties are then disbursed to the appropriate Indian Tribe or allottee. See 30 C.F.R. §§ 218.51, 219.103. The MMS is required to collect payments and to have "a comprehensive . . . accounting and auditing system . . . to accurately determine oil and gas royalties." 30 U.S.C. § 1711(a).

As discussed above, Section 3729(a)(7) imposes liability for making "a false record or statement to conceal, avoid, or decrease an obligation to pay or *transmit* money . . . to the Government." (emphasis added). Pursuant to § 3729(a)(7),

Relators are required to allege that Comstock had "an existing, legal 'obligation to pay or transmit money or property to the Government'" and that Comstock submitted false statements or records to conceal, avoid, or decrease that obligation.  See United States v. Pemco Aeroplex, Inc., 195 F.3d 1234, 1236-37 (11th Cir. 1999).  Comstock cannot dispute that it had a legal obligation to transmit royalty payments to the Government.  Relators have alleged that Comstock submitted false reports to avoid its obligation.  We therefore hold that the plain language of § 3729(a)(7) squarely encompasses the fraud on the Government that occurs when a person or entity makes false statements to the United States to avoid transmitting to the Federal Treasury royalties they owe on Indian mineral leases.

**REVERSED** and **REMANDED**.[6]

---

[6]Comstocks' motion for leave to file a supplemental brief in response to the brief for the United States which was received by the court on May 7, 2003, is **GRANTED**.