FILED
United States Court of Appeals
Tenth Circuit

December 28, 2017

Elisabeth A. Shumaker
Clerk of Court

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA EX
REL. BRANDON BARRICK,

Plaintiff/Relator -
Appellant,

v.

PARKER-MIGLIORINI
INTERNATIONAL, LLC; PARKER
INTERNATIONAL, INC., also known
as PMI Foods-USA; COTTONWOOD
TRADING, LLC; FORTUNA FOODS,
LLC, JOHN AND JANE DOES 1-10,

Defendants - Appellees.

No. 16-4136

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:12-CV-00381-DB)**

---

Ann Marie Taliaferro (James C. Bradshaw and Mark R. Moffat, Brown, Bradshaw
& Moffat, L.L.P., and Robert B. Cummings, The Salt Lake Lawyers, Salt Lake
City, Utah, with her on the briefs), Brown, Bradshaw & Moffat, L.L.P., Salt Lake
City, Utah, for Appellant.

Mark R. Gaylord (Tesia N. Stanley and Tyler M. Hawkins with him on the brief),
Ballard Spahr LLP, Salt Lake City, Utah, for Appellees.

---

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **LUCERO**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

Brandon Barrick brought this action under the False Claims Act on behalf of the United States, alleging his former employer Parker-Migliorini International (PMI) illegally smuggled beef into Japan and China. At the time of the scheme, China banned all imports of U.S. beef, and Japan imposed heightened standards, under which certain types of U.S. beef would have been banned.

The False Claims Act prohibits false or fraudulent claims for payment to the United States. 31 U.S.C. § 3729(a)(1)(A). The Act authorizes enforcement either by the Attorney General, *id.* § 3730(a), or by private individuals like Barrick, called "relators," who bring *qui tam* actions in the government's name, *id.* § 3730(b)(1).[1] Section 3729(a)(1)(G) of the Act also creates liability for so-called "reverse false claims." These claims reverse the typical claim under the Act: instead of creating liability for wrongfully *obtaining* money from the government, the reverse-false-claims provision creates liability for wrongfully *avoiding* payments that should have been made to the government. But, crucially, liability under the reverse-false-claims provision requires the existence of an "obligation"—defined as an "established duty"—to pay money to the government. *Id.* § 3729(a)(1)(G).

---

[1] *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 n.2 (2007) ("Qui tam is short for '*qui tam pro domino rege quam pro se ipso in hac parte sequitur*,' which means 'who pursues this action on our Lord the King's behalf as well as his own.'").

In this case, Barrick alleges PMI cheated the government out of the inspection fees that would have been paid if PMI had complied with federal law. The United States Department of Agriculture (USDA) charges an hourly rate for the process of inspecting and certifying meat for export to a country only if the country has higher standards than the United States. In order to smuggle beef into Japan and China, PMI lied about the beef's destination. PMI gave sham destinations—Moldova or several Central American countries—which have import standards equal to or less than the United States. Based on these sham destinations, the USDA provided its usual (free) inspection rather than the appropriate heightened (reimbursable) inspection.

In Barrick's view, an "obligation" to pay the government arises when the USDA is informed that meat is being exported to a country with inspection standards higher than those in the United States. Thus, the government should have been paid for the inspections that would have occurred if PMI had accurately reported the destination countries.

We disagree. Barrick cannot allege there was an "established duty" to pay the government for inspections for the smuggled beef. First, the obligation would never have arisen for the beef smuggled to China, where it was altogether banned. The relevant regulations do not impose a charge for ascertaining whether a given destination country bans the import of U.S. meat, which is where the process would have ended. Second, the obligation for the beef smuggled to Japan did not

rise to the level of an "established duty." An established duty is one owed at the time the improper conduct occurred, not a duty dependent on a future discretionary act. Here, the obligation would not have arisen absent a third-party meat supplier's independent wrongful conduct. This is because the meat supplier supplies the destination country to the USDA, thus controlling the type of inspection performed. But PMI did not use meat suppliers who were eligible to export beef to Japan. So, for an obligation to arise, the supplier would have had to report an accurate—and illegal—destination country to the USDA, even though the supplier was not eligible to export to that country. This conduct does not create an established duty under the Act.

Therefore, because we do not find Barrick can adequately plead the existence of such an "obligation" by PMI as the statute requires, we **AFFIRM** the district court's denial of Barrick's motion for leave to amend.

## I. Background

We begin with an overview of USDA regulations governing the inspection and certification of meat destined for export. Then, we summarize Barrick's allegations, the applicable provision of the False Claims Act, and the grounds for the district court's denial of leave to amend.

## A. *The Export Certification Process*

Federal law requires the USDA to inspect and certify meat destined for export. *See* 21 U.S.C. §§ 615–618; 9 C.F.R. §§ 322.2, 322.4. The USDA delegates the responsibility for performing these inspections to the Food Safety and Inspection Service (FSIS). 9 C.F.R. § 300.2. The export certification process normally involves the following three steps.

*First*, a supplier completes an export application and provides it to a FSIS employee. FSIS Directive 9000.1, Export Certification (U.S.D.A. 2006), at 1. This application indicates the destination country, the establishment from which the product is exported, and the name of the products being exported. FSIS Form 9060-6 ("Application for Export Certificate").

*Second*, the FSIS employee verifies the information on the application and performs a physical inspection. This step includes verifying the product meets the requirements of the destination country. FSIS Directive 9000.1, at 1–2, 4–6. The FSIS employee does so by consulting the "Export Library," a list of requirements officially communicated to FSIS by various countries. FSIS Directive 9000.1, at 3; USDA, *Export Library* (Sept. 1, 2017), https://www.fsis.usda.gov/wps/portal/fsis/topics/international-affairs/exporting-products/export-library-requirements-by-country. After verifying the information on the application, the FSIS employee signs the application and issues an export certificate. FSIS Form 9060-5 ("Export Certificate of Wholesomeness").

*Third*, a FSIS certifying official compares the completed export certificate and the signed application. This step includes verifying again that the information is consistent with the destination country's requirements. If the certifying official deems the export certificate accurate, he signs it. The product is then eligible for export. FSIS Directive 9000.1, at 2, 7–8.

Domestic meat quality standards provide a baseline for exported American meat. For some countries, that is enough—meat that satisfies U.S. law is good enough for them. Other countries, however, impose additional requirements. When that is the case, "[o]nly facilities and products which meet those specific requirements are eligible to export products to that country." FSIS, *Export Certification*, at 41-25 (Apr. 14, 2017), https://www.fsis.usda.gov/wps/wcm/connect/338f8b52-09e6-477f-bb5b-da6c4f3a996e/42_IM_Export_Certification.pdf?MOD=AJPERES.

Another division of the USDA, the Agricultural Marketing Service, administers Export Verification and Quality System Assessment (EV/QSA) Programs, which ensure these specific requirements are met. *Id.* The Marketing Service reviews and approves companies as eligible suppliers under the EV/QSA programs, and maintains lists of approved suppliers. *Id.* Suppliers must also maintain lists of products intended for export, which are approved by the Marketing Service. *Id.* Again, only eligible products from eligible suppliers can be exported to countries that require an EV/QSA program.

The export certification process is more thorough for products exported to countries that require an EV/QSA program. When the FSIS employees review the export applications—the second step of the process—they must always check the requirements of the destination country. *Id.* at 41-27. If they see the destination country requires an EV/QSA program, they take additional steps, including ensuring that the facility is eligible to export to that country and that the product is eligible for export to that country. *Id.*

Another difference is that the export certification process can entail charges if suppliers export to countries that require an EV/QSA program.

The USDA distinguishes between "basic export services" and "voluntary reimbursable services." The distinction is that FSIS charges suppliers for voluntary reimbursable services, but not for basic export services. *See* FSIS Directive 9000.1 at 3 ("When export certification services are performed in an official establishment[], the issuance of export certificates that are required by 9 CFR Part 322 and 381.104 through 381.111 are not reimbursable services."); *see also* FSIS Directive 12,600.1, Voluntary Reimbursable Inspection Services (U.S.D.A. 2007), at 2, 3 (same). "Only the execution of certifications that are in addition to FSIS regulatory requirements[] (e.g., additional certifications that are required by the importing country . . . ) are considered reimbursable services." FSIS Directive 12,600, at 3. Thus, since it is part of the typical FSIS inspection,

"[b]asic export services include verifying . . . that country requirements are met for the applicable products." *Export Certification*, at 41-33.

But—and this is the central issue in this case—verifying compliance with an EV/QSA program is a reimbursable expense. *Id.* at 34; *see also* 9 C.F.R. § 350.3(b) (authorizing inspectors to make certifications regarding livestock for export where conditions are in addition to those imposed by U.S. law), 9 C.F.R. § 350.7 (requiring export applicants to pay fees and charges for inspections under Part 350).

In this context, the trigger for the charge is when the FSIS employee looks at the Export Library—FSIS's list of requirements for various countries—and sees the country in question requires an EV/QSA program. The charge cannot be triggered before then, since the FSIS employee always consults the Export Library as a matter of routine. But the additional steps the employee must then carry out—for example, checking that the facility is an eligible supplier and that the product is eligible for export under the relevant EV/QSA program—would incur a fee, since they are not part of the normal export certification process.

### B. PMI's Scheme

PMI's business includes exporting meat to local wholesale markets around the world. When PMI exports meat outside the United States, it places an order with an eligible supplier, informing the supplier of the destination country. *See* App. 245–46, 267. Based on that destination, the supplier applies for the proper

export certificate and obtains the proper inspection from FSIS. Thus, by supplying the destination, PMI controls which inspection occurs.

The complaint alleges PMI smuggled beef into Japan and China to avoid complying with those countries' import restrictions. After receiving an order from Japan or China, PMI would place an order with a meat supplier. At the time of the scheme, China banned all imports of U.S. beef, and Japan required an EV/QSA program because it banned beef from cattle slaughtered over 30 months in age. So, if the actual destination was Japan, PMI would inform the supplier the destination was a Central American country. If the actual destination was China, PMI would inform the supplier the destination was Moldova. FSIS would inspect the meat for free, since the sham destination countries named by PMI all have standards equal to or less than the United States.

Meat destined for Japan would be shipped to Central America, repackaged and passed off as local beef, and shipped to Japan. PMI allegedly referred to this method of getting meat into Japan as the "Japan Triangle." App. 241. Meat destined for China would be shipped to Hong Kong, never making it to Moldova, and smuggled from there into China. PMI allegedly referred to this method of getting meat into China as the "LSW Channel." App. 242.

At the time, U.S. beef heading to Hong Kong had to comply with an EV/QSA program. FSIS would only give an Export Certificate for Hong Kong to eligible products produced by eligible suppliers—everything meeting the

requirements of the EV/QSA program. So PMI did not want the product inspected as if it was going to Hong Kong—it could only have shipped eligible products from eligible suppliers and would have had to pay for any inspections. But Hong Kong would not have accepted the beef in question because it would not have been an eligible product. That is why PMI claimed the meat was destined for Moldova.

### C. Procedural Background

Barrick worked for PMI as a financial analyst from 2007 to 2012. In 2012, Barrick filed his original False Claims Act complaint under seal, providing the government with a copy so the United States could determine whether to intervene. After reviewing the sealed complaint, the FBI initiated a criminal investigation into PMI. This investigation led PMI to plead guilty to violating 21 U.S.C. § 611(b)(5), for knowingly making a false statement in a certificate required under USDA regulations. This is a misdemeanor, and PMI paid a million dollar fine.

In 2015, the government declined to intervene in this action, so Barrick proceeded as a relator on the government's behalf. Barrick raised three claims under the False Claims Act: a reverse false claim, a conspiracy claim, and a retaliatory firing claim. After the district court dismissed Barrick's complaint for various pleading deficiencies, Barrick sought leave to amend his complaint. The district court allowed Barrick to proceed with his retaliatory filing claim, but

denied leave to amend on the reverse false claim and the conspiracy claim, explaining amendment would be futile: Barrick failed to allege PMI had avoided an obligation to pay the government. In the district court's view, PMI's scheme was not about avoiding inspection fees; it was about getting banned meat into China and Japan. PMI never would have paid the inspection fees, since they never wanted the meat inspected—the whole point was that the meat would not have passed inspection under the applicable standards. And the beef headed to China could not have been inspected, since China banned all U.S. beef. So there would never have been an obligation to pay inspection fees. The district court certified the denial of the motion to amend as a final order under Federal Rule of Civil Procedure 54(b), from which Barrick now appeals.

On appeal, we are only concerned with the substantive False Claims Act claims, not the retaliation claim, which remains before the district court.

## II. Analysis

Barrick argues the district court erred by finding that amending the complaint would be futile because Barrick failed to allege the existence of an obligation. "'A proposed amendment is futile if the complaint, as amended, would be subject to dismissal.'" *Barnes v. Harris*, 783 F.3d 1185, 1197 (10th Cir. 2015) (quoting *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1018 (10th Cir. 2013)). "A complaint is subject to dismissal under [Federal Rule of Civil Procedure] 12(b)(6) if the plaintiff fails to allege facts that would 'allow[ ] the

-11-

court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Fields v. City of Tulsa*, 753 F.3d 1000, 1012–13 (10th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Although we generally review for abuse of discretion a district court's denial of leave to amend a complaint, when this denial is based on a determination that amendment would be futile, our review for abuse of discretion includes de novo review of the legal basis for the finding of futility." *Barnes*, 783 F.3d at 1197 (quoting *Cohen v. Longshore*, 621 F.3d 1311, 1314 (10th Cir. 2010)).

## A. *The Reverse-False-Claims Provision*

As explained above, the reverse-false-claims provision, 31 U.S.C. § 3729(a)(1)(G), reverses the typical claim under the False Claims Act: instead of creating liability for wrongfully *obtaining* money from the government, the reverse-false-claims provision creates liability for wrongfully *avoiding* payments that should have been made to the government.

Since the last time our court addressed this provision, in *U.S. ex rel. Bahrani v. Conagra, Inc.*, 624 F.3d 1275, 1279 (10th Cir. 2010) and *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189 (10th Cir. 2006), Congress has amended it.[2] Before 2009, the reverse-false-claims provision imposed liability on any person who "knowingly makes, uses, or causes to be made or used, a false record

---

[2] For clarity, we note that all subsequent references to *Conagra* refer to the 2006 case.

or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7) (1994). The 2009 amendments changed the statute in two significant ways.

First, Congress added a second route to liability. The reverse-false-claims provision now imposes liability on any person who:

> [1] knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or [2] knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G) (bracketed numbers added for clarity). This second route to liability expands on the first by not requiring a "false record or statement." Simply "knowingly and improperly avoid[ing] . . . an obligation to pay or transmit money or property to the Government" is enough. But, under either clause of this provision, there must exist an "obligation to pay . . . money . . . to the government."

Second, Congress added a definition for the term "obligation," which the statute had not previously defined. As amended, "obligation" means "an *established* duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3) (emphasis added).

-13-

For our purposes, "established" is the key word in this definition. As the Fifth Circuit recently explained, "'established' refers to whether there is *any* duty to pay . . . ." *U.S. ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1037 (5th Cir. 2016); *accord U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 505 (3d Cir. 2017) ("[A]n 'established duty' more likely refers to one owed at the time that the alleged improper conduct under the FCA occurred. . . . [T]he term does not include a duty that is dependent on a future discretionary act."). Under this interpretation, a duty to pay must be formally "established" before liability can arise under the False Claims Act. *Simoneaux*, 843 F.3d at 1038–40; *see also Petras*, 857 F.3d at 506 ("[F]or a reverse FCA claim, the definition of an 'obligation' refers to one existing at the time of the improper conduct to pay the Government funds, the amount of which may not be fixed at the time of the improper conduct."). In other words, there is no liability for obligations to pay that are merely potential or contingent.

We have not previously addressed the definition of "obligation" added by the recent False Claims Act amendments, but in prior cases we explained that potential obligations were not actionable under the statute prior to amendment. *See Conagra*, 465 F.3d at 1195–97, 1203. In *Conagra*, we explained that a plaintiff must allege the defendant "had an *existing legal obligation* to pay or transmit money or property to the government." *Id.* at 1195 (quoting *Kennard v. Comstock Res. Inc.*, 363 F.3d 1039, 1048 (10th Cir. 2004)). And "the obligation

-14-

must arise from some independent legal duty." *Id.* That meant that "potential obligations . . . are not properly the subject of a suit under [the reverse-false-claims provision.]" *Id.* at 1196 (quoting *U.S. ex rel Huangyan Imp. & Exp. Corp. v. Nature's Farm Prod., Inc.*, 370 F. Supp. 2d 993, 1000 (N.D. Cal. 2005)). We also explained that where government officials were afforded discretion to determine whether to charge fees, the obligation was "contingent" and thus outside the scope of the provision. *Id.* at 1203.

Nothing in the statute's new definition of "obligation" abrogates our previous approach.

### B. Application to PMI's Scheme

PMI contends that the allegations do not support a cause of action under either clause of § 3729(a)(1)(G). We agree with the district court that they do not. Barrick cannot allege there was an "established duty" to pay the government for inspections for the smuggled beef.

China is the easier case. There were no eligible suppliers for China during this period, since China banned all U.S. beef. During the normal phase of the inspection process—for which no charge applies—the FSIS employee would discover from the Export Library that China prohibited imports of U.S. beef. The inspection would never have reached a stage where charges could be incurred.

The fact that the meat stopped in Hong Kong, a permissible export destination, before traveling to China does not affect our analysis. The Act does

-15-

not require that suppliers pay for an inspection to comply with import standards in a country that is merely a stop en route to their destination country. Thus, the fact that a shipment of meat might have stopped in Central America or New Zealand or Indonesia does not matter for analytical purposes.

Japan requires several more analytical steps, however, but no obligation to pay the government would have arisen in that context either. Barrick does not allege PMI used suppliers eligible to export to Japan. Quite the opposite: he alleges the point of the scheme was to smuggle banned beef (that is, ineligible products from ineligible suppliers) into Japan.

Because the suppliers were ineligible, two things would need to happen for inspection fees to arise for the beef smuggled to Japan, even supposing PMI accurately reported the destination to its ineligible suppliers.

1. PMI and the supplier would have to agree to export to Japan even though the supplier is ineligible. In other words, without the supplier's collusion, no inspection fees would arise. If the supplier declined on the grounds that it was ineligible to ship to Japan, no inspection fees would arise.

2. Despite the illegality of the arrangement, the supplier would have to accurately list Japan as the destination on the export application. So, after deciding to break the law, the supplier would have to decide to tell that to FSIS in order for any inspection fees to arise. If the supplier listed a

destination country with standards equal to or less than the U.S. standards, no fees would arise.

Only if these two things happened would any inspection fees arise. If they did happen, some amount of fees would have arisen: the FSIS employee would look at the export application, and access the Export Library to determine Japan's requirements. At this point, the FSIS employee would see that Japan requires an EV program, triggering inspection fees. But the inspection would be extremely short: the FSIS employee would look to see if the supplier is eligible, find it is not, and reject the application.

The key is that for an obligation to arise here, it requires not only the supplier's complicity in an illegal scheme, but the supplier's willingness to list the true destination—and be found out easily. This requires at least the two assumptions above—if PMI or the third-party supplier decided not to go through with any of those steps, no inspection fees would arise.

The obligation to pay is thus potential and contingent, as we explained in *Conagra*, because it depends on multiple assumptions, as well as a third party's wrongful acts. That is, even if PMI had told an ineligible supplier it wished to export beef to Japan, there would not have been an inspection unless the supplier cooperated in the smuggling. But, in order to create liability, the obligation must be formally established at the time of the improper conduct, not dependent on a

future discretionary act—let alone two acts, let alone implausible ones, let alone by a third party.

Barrick contends our decision in *Conagra*, 465 F.3d 1189, supports his interpretation of the Act. In *Conagra*, the plaintiff alleged employees of Conagra, a meat and hide exporter, routinely altered USDA export certificates. If an export certificate contained a substantive deficiency—for example, "the destination of the product"—USDA regulations required FSIS to issue a new certificate, for which they would charge Conagra. *Id.* at 1193. Rather than obtain replacement certificates, Conagra employees would alter or forge export certificates to avoid fees the company would otherwise have to pay. *Id.* at 1194. We found the USDA's requirement that Conagra obtain replacement certificates in certain situations and pay an accompanying fee constituted an "obligation" under the statute. *Id.* When Conagra employees determined changes were necessary, it triggered an established duty to pay the USDA to issue new certificates. Absent Conagra altering the certificates, they would have had to pay the USDA for new certificates. The wrongful act is at one remove from the obligation.

But *Conagra* is not on point. Absent PMI lying about the destination country, the obligation would not have arisen automatically. For China, the obligation would never have arisen—even if the supplier had colluded in the scheme and accurately listed China as the destination, the export application would have been rejected without incurring a charge. For Japan, the wrongful act

-18-

would be at two removes—at least—from the obligation. Absent PMI's misrepresentation about Japan as the destination country, (1) the supplier would have to collude illegally in the scheme, and (2) the supplier would have to report accurately the illegal destination to the FSIS employee. In contrast, the obligation at *Conagra* was automatic: Conagra employees determining that changes to the certificates were necessary triggered a legally established duty to pay the USDA to issue new certificates. Under the relevant law, Conagra's determination was both a necessary and a sufficient condition for a monetary obligation.

In sum, the obligation in this case is not an "established duty" and the alleged fraudulent conduct does not create liability under the False Claims Act.

## III. Conclusion

We therefore **AFFIRM** the district court's denial of Barrick's motion for leave to amend because Barrick's proposed amendment would be futile. The complaint, as amended, would be subject to dismissal under Federal Rule of Civil Procedure 12(b)(6), because Barrick fails to allege facts that would allow the court to draw the reasonable inference that the defendant is liable under the False Claims Act's reverse-false-claims provision. Such an inference would require alleging that there was an "established duty" to pay the government—which, for the reasons explained, Barrick cannot do.