[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
11/15/99
THOMAS  K. KAHN
CLERK

_____

No. 97-6910

_____

D. C. Docket No. 97-P-1300-S

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

PEMCO AEROPLEX, INC.,
a subsidiary of Precision Standard
Company, a corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern  District of Alabama

_____

(November 15, 1999)

Before ANDERSON, Chief Judge, TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS and WILSON, Circuit Judges.

HULL, Circuit Judge:

The United States ("government") appeals the district court's dismissal of its False Claims Act and state common law claims against appellee Pemco Aeroplex, Inc. ("Pemco"). The specific issue we decide is whether the district court erred in dismissing for failure to state a claim under Fed. R. Civ. P. 12(b)(6) the government's "reverse false claim" under the False Claims Act, 31 U.S.C. § 3729(a)(7). We conclude that the government has stated a claim under § 3729(a)(7) and thus reverse the dismissal of its complaint.

## I. BACKGROUND

The complaint alleges that Pemco performed high-level maintenance of C-130 aircraft as a contractor for the United States Air Force ("Air Force"), and as a result of its contracts with the Air Force, Pemco had on its premises both older model and newer model C-130 wings belonging to the government. As asserted in the complaint, Pemco possessed five wings (three right-side wings and two left-side wings) belonging to the government that "were not needed by PEMCO for performance of its contracts with the United States." Consequently, Pemco initiated a procedure known as "Plant Clearance" in order to have the government instruct Pemco regarding the return of the wings to the Air Force or other disposal.[1]

_____

[1] The Federal Acquisition Regulations define "Plant Clearance" as "all actions relating to the screening, redistribution, and disposal of contractor inventory from a contractor's plant or work site." 48 C.F.R. § 45.601. Under these Regulations, a government contractor must use Standard Form 1428, Inventory Schedule B to advise the government that it is holding certain government

2

The complaint states that "[u]nder the Plant Clearance procedure, the contractor (in this case PEMCO) advises the government that the contractor is holding certain property belonging to the United States in excess to the needs of its [g]overnment contract." The complaint also explains that the contractor may offer to purchase the property from the government, and the government can elect to sell the property to the contractor rather than having the contractor return the property or providing alternative disposition instructions to the contractor.

As asserted in the complaint, "PEMCO submitted to the United States a document entitled 'Inventory Schedule B' which was part of the 'Plant Clearance' procedure mentioned above." The complaint continues that, on this Inventory Schedule B, Pemco listed the five wings and described those wings using one national stock number for the right-side wings and another for the left-side wings. The government uses national stock numbers for correct and precise identification of items within its inventory system. However, according to the complaint, the national stock numbers Pemco used in its Inventory Schedule B incorrectly

---

property in excess of its government contract. See 48 C.F.R. § 45.606-5(a)(2). The government may then "exercise its rights to require delivery of any contractor inventory," or dispose of the property through: (1) allowing the contractor to purchase the property at cost; (2) returning the property to the suppliers; (3) donating the property to "eligible donees"; (4) selling the property, "including purchase or retention at less than cost by the prime contractor"; (5) donating the property to public bodies; or (6) abandoning or destroying the property. See 48 C.F.R. § 45.603.

referenced older, obsolete model wings that the government routinely disposed of as scrap.

The complaint asserts that in its Inventory Schedule B, Pemco offered to purchase the five wings for a total price of $1,875, the scrap value corresponding to the national stock numbers for older, obsolete model wings. The complaint alleges that Pemco knew that the national stock numbers it used in its Inventory Schedule B were incorrect and that the five newer model wings actually in its possession were worth substantially more than $1,875. According to the complaint, as a result of Pemco's use of the incorrect national stock numbers, the government agreed to sell the five wings to Pemco for $1,875. The complaint asserts that Pemco, shortly after purchasing these five wings from the government for $1,875, sold just two of the five wings for approximately $1,500,000. The complaint also estimates the total market value of the five newer model wings actually in Pemco's possession to be at least $2,071,526.

The government sued Pemco in the United States District Court for the Northern District of Alabama, alleging that Pemco had violated the False Claims Act, 31 U.S.C. §§ 3729-3733, and also alleging state common law counts of mistake of fact and unjust enrichment. With regard to the False Claims Act count, the complaint specifically contended that Pemco "knowingly made, used, or caused

4

to be made or used, false statements or actions for the purpose of obtaining property from the United States," "knowingly presented, or caused to be presented, to an officer or employee of the United States Government a false or fraudulent claim for approval," and "knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government." The district court granted Pemco's motion to dismiss the False Claims Act count for failure to state a claim under Rule 12(b)(6). The court also dismissed the government's state law counts but did not specify the grounds for dismissal.

A panel of this Court affirmed the district court's dismissal. United States v. Pemco Aeroplex, Inc., 166 F.3d 1311 (11th Cir. 1999). However, we vacated the panel opinion in order to hear the case en banc. United States v. Pemco Aeroplex, Inc., 179 F.3d 1327 (11th Cir. 1999).

## II. STANDARD OF REVIEW

We review de novo a dismissal for failure to state a claim, applying the same standard used by the district court. Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir.), cert. denied, — U.S. —, 119 S. Ct. 509 (1998). We must accept the allegations set forth in the complaint as true for purposes of a motion to dismiss. Gonzalez v. McNary, 980 F.2d 1418, 1419 (11th Cir. 1993).

5

Additionally, the district court's disposition of Pemco's motion to dismiss involved interpretation of the False Claims Act, and we review de novo questions of statutory interpretation. Id.

### III. DISCUSSION

The "reverse false claim" provision of the False Claims Act, 31 U.S.C. § 3729(a)(7), allows the government to recover a civil penalty from any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." The government included the language of § 3729(a)(7) almost verbatim in the False Claims Act count of the complaint.

The complaint also has sufficient allegations to survive a motion to dismiss for failure to state a cause of action under § 3729(a)(7). The complaint contains express references to Pemco's contracts with the Air Force, emphasizing that the five wings at issue belonged to the government and that Pemco obtained the wings "as a result" of its contracts with the Air Force. The complaint alleges that, after Pemco determined that those five wings exceeded its contractual needs, Pemco submitted an Inventory Schedule B to initiate the Plant Clearance procedure and to receive instructions from the government regarding disposition of the wings. The complaint asserts that Pemco knowingly used the wrong national stock numbers on

6

this inventory schedule so the government would accept Pemco's offer to purchase the five wings for a total price of $1,875--a price substantially less than the wings' actual market value. According to the allegations in the complaint, Pemco misstated the national stock numbers to avoid accounting to the government for the full value of the wings.

The complaint's allegations make clear that Pemco had an existing, legal "obligation to pay or transmit money or property to the Government" for purposes of § 3729(a)(7).[2] As already mentioned, the complaint contains express references to Pemco's having an obligation under its contracts with the government to account for the full value of the five wings in its possession. According to the complaint, these contracts required Pemco, upon determining that it possessed excess government property, to submit an inventory schedule identifying the excess property and to dispose of that property in accordance with the government's instructions. The complaint also explains that, rather than selling excess property to a contractor such as Pemco, the government could require its contractors either to return excess government property or to make some other disposition of that property. Thus, Pemco also had an existing contractual obligation either to return

_____

[2] The government asks us to hold that a potential obligation would satisfy the requirements of § 3729(a)(7), but we do not reach that issue because the obligation here is so clearly an existing obligation.

7

(i.e., "transmit" under § 3729(a)(7)) or to purchase (i.e., "pay" for under § 3729(a)(7)) the excess government property it possessed.

Pemco argues that it was required to return the wings only at the end of its government contract or at an earlier date if required by the government's contracting officer. According to Pemco, because neither of those events had occurred, Pemco did not have an existing obligation to return or pay for the wings at the time it submitted the inventory schedule. In addition, Pemco argues that the submission of the inventory schedule was merely an offer to purchase the excess wings but did not establish either an obligation to purchase or the specific purchase price. According to Pemco, at best, this offer created only a contingent obligation to purchase--dependent on the government's inspection of the property and acceptance of Pemco's offer.

These arguments ignore the complaint's allegations that at the time Pemco submitted its inventory schedule to the government, the wings were deemed excess, and that thus Pemco had a specific legal obligation at that time to dispose of any excess property in accordance with the government's instructions. Indeed, Pemco only submitted the inventory schedule because the wings were deemed excess, and Pemco also had a pre-existing contractual obligation to submit such a form to initiate the Plant Clearance procedure for excess government property.

8

That Pemco offered to purchase the property and that a specific purchase price had not been agreed upon at the time Pemco submitted the inventory form are not the touchstone. As alleged in the complaint, Pemco had government property in its possession and a contractual obligation to account for the full value of any excess government property by returning that property or otherwise disposing of it in accordance with the government's instructions. This legal obligation was a specific, ongoing obligation during the life of the contract and did not begin or end at any one point in time. This is the relevant obligation and submitting the inventory form was just part of fulfilling this pre-existing contractual obligation.

Pemco relies on United States v. Q International Courier, Inc., 131 F.3d 770 (8th Cir. 1997), but that decision does not involve a government contract. Instead, Q International Courier involves a mail courier firm that transferred bulk mail from the United States to Barbados in order to remail the letters individually from Barbados to the United States. Id. at 772. Through this scheme, Q International Courier ("Quick") was able to take advantage of the discounted rates the United States Postal Service charged the Barbadian postal service, achieving significant savings for its customers. Id. In contrast to this case, Quick was not a government contractor. Id. at 772-73. Thus, any "obligation" Quick may have owed to the government could only have derived from statutes, regulations, judgments--legal

9

sources other than a written contract. Indeed, the Eighth Circuit in <u>Q International Courier</u> explicitly noted that the government did not have a contract with Quick, thereby suggesting that a contractual duty would qualify as an "obligation" in its opinion. <u>Id.</u> at 773. In addition, the Eighth Circuit in <u>Q International Courier</u> concluded that no obligation to pay domestic postage rates could be found in any of the statutes or regulations cited by the government. <u>Id.</u> at 773-74.

In contrast, Pemco had a written contract which expressly obligated Pemco to be responsible and accountable for the government property in its possession and to return that property to the government or dispose of the property in accordance with the government's instructions. In addition, the government has pointed to regulations that obligate Pemco to return government property not needed in the performance of the contract. <u>Q International Courier</u>, if anything, shows why the district court erred in dismissing the government's complaint for failure to state a claim under Rule 12(b)(6).[3]

## IV. CONCLUSION

_____

[3] In its en banc brief, Pemco also relies on <u>American Textile Mfrs. Inst., Inc. v. The Limited, Inc.</u>, 190 F.3d 729 (6th Cir. 1999), where the defendants allegedly submitted false claims relating to their importation of textiles and apparel into the United States, in order to avoid paying penalties to the government for violating customs laws. <u>Id.</u> at 731-32. In that case, the Sixth Circuit concluded that potential liability under a statute is not an "obligation" for purposes of § 3729(a)(7). <u>Id.</u> at 738-41. However, Pemco's reliance on <u>American Textile</u> is misplaced because <u>American Textile</u> also does not involve a government contract.

10

Because we conclude that the government stated a claim under § 3729(a)(7), we reverse the order of dismissal and remand with directions to reinstate this case. Additionally, Pemco argues that the Contract Disputes Act, 41 U.S.C. §§ 601-613, deprives the district court of subject matter jurisdiction over the government's common law claims in Counts II and III of the complaint. The district court's dismissal order did not address this issue. Given the fact that we require reinstatement of the federal claim, we leave for the district court to decide in the first instance on remand whether subject matter jurisdiction exists over the government's common law claims in Counts II and III.

We reverse the district court's dismissal of the federal claim brought under § 3729(a)(7) in Count I, vacate the dismissal of the common law claims in Counts II and III, and remand this case for further proceedings consistent with this opinion.

**REVERSED IN PART; VACATED AND REMANDED IN PART.**

11