**F I L E D**

**PUBLISH**

**October 12, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA, ex rel., ALI BAHRANI,

Plaintiff-Appellant,

v.

No. 04-1407

CONAGRA, INC.; CONAGRA FOODS, INC.; CONAGRA HIDE DIVISION; CONAGRA BEEF COMPANY; and MONTFORT, INC.,

Defendants-Appellees.

---

UNITED STATES OF AMERICA,

Amicus Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**
**(D.C. No. 00-K-1077(PAC))**

---

G. Bryan Ulmer, III, The Spence Law Firm, LLC, Jackson, Wyoming (George Harold Parker, Jr., Dedolph & Parker, LLC, Fort Collins, Colorado, with him on the briefs), for the Plaintiff-Appellant.

Darrel G. Waas, Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Denver Colorado (Patricia C. Campbell, Otten, Johnson, Robinson, Neff & Ragonetti, P.C.; Edward G. Warin, McGrath, North, Mullin, & Kratz, P.C., L.L.O., Omaha, Nebraska; and Carol C. Payne, Vinson & Elkins, L.L.P, Dallas, Texas, with him on the brief), for the Defendants-Appellees.

Peter D. Keisler, Assistant Attorney General, Douglas N. Letter, Appellate Litigation Counsel, Michael D. Granston and Alan E. Kleinburd, Attorneys, Civil Division, United States Department of Justice, Washington D.C., for amicus curiae, the United States of America.

Before **HENRY**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

**HENRY,** Circuit Judge.

Ali Bahrani filed this reverse false claims action against his former employer Conagra, and its related corporations, which are engaged in exporting meat products and animal hides. He alleged that employees at Conagra's Greeley, Colorado office routinely altered export certificates issued by the United States Department of Agriculture (USDA) in order to avoid obtaining replacement certificates for which the company should have paid a fee, in violation of the reverse false claims provision of the False Claims Act, 31 U.S.C. § 3729(a)(7). Mr. Bahrani maintained that by altering the export certificates, Conagra employees "used . . . a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7).

The district court granted summary judgment to Conagra, reasoning that Conagra's alleged "obligation" to obtain the replacement certificates was not "quantifiable and existing before the allegedly fraudulent acts taken to avoid it." See United States ex rel. Bahrani v. Conagra, Inc., 338 F. Supp. 2d 1202, 1207 (D.

2

Colo. 2004). We disagree with the district court's reasoning. The record indicates that, as to a certain class of errors and omissions in export certificates—those deemed "major" or "significant"—the USDA required Conagra to obtain replacement certificates and pay the accompanying fee. In our view, that requirement is sufficient to constitute an "obligation" under § 3729(a)(7). Because we are not persuaded by Conagra's arguments that we affirm on alternative grounds, we vacate the district court's grant of summary judgment and remand for further proceedings.

## I. BACKGROUND

We begin with an overview of USDA regulations governing export certificates. Then, we summarize Mr. Bahrani's allegations, the applicable provision of the False Claims Act, 31 U.S.C. § 3729(a)(7), and the grounds for the district court's grant of summary judgment to Conagra. We view the record in the light most favorable to Mr. Bahrani. See Terra Venture, Inc. v. JDN Real Estate Overland Park, L.P., 443 F.3d 1240, 1243 (10th Cir. 2006).

### A. USDA Export Certificates

To facilitate and promote foreign trade and to protect the food supply, the USDA provides certificates to companies that export animal products. These export certificates are part of a comprehensive scheme administered by the Food

3

Safety and Inspection Service ("the Food Inspection Service"), which regulates meat exports, and the Animal Plant Health Inspection Safety Service ("the Animal Inspection Service"), which regulates hide exports. See 9 C.F.R. §§ 130, 156, 307, 322.2, 350, 351, 390. The regulations are authorized by the Federal Meat Inspection Act, 21 U.S.C. §§ 601-695, the Poultry Products Inspection Act, 21 U.S.C. §§ 451-471, and the Agricultural Marketing Act, 7 U.S.C.§§ 1621-27.

Under the Food Inspection Service regulations, exporters are required to obtain certificates from USDA inspectors for each shipment. Each certificate has a unique serial number and states the shipment's destination, the exporter, the consignee, and the number and kinds of products it contains. 9 C.F.R. § 322.2. The destination may affect the content of the certificates: some countries require more information than the Food Inspection Service does, and, in those instances, the USDA provides exporters with certificates that comply with those other countries' requirements.

The Animal Inspection Service regulations contain a similar provision addressing certificates for exports of animal hides. 9 C.F.R. § 156.3. In contrast to the Food Inspection Service regulations, the Animal Inspection Service regulations do not require a certificate for every shipment. However, some foreign countries do require certificates, and the Animal Inspection Service regulations provide that exporters shipping hides to those countries may obtain a certificate from an inspector.

4

The Food Inspection Service and the Animal Inspection Service both charge fees for the certificates. The Food Inspection Service's export certificate fee is based upon the time expended by its inspectors for providing information over and above the minimum certification requirements set forth by federal law. See 9 C.F.R. §§ 307.4–307.6, 322.2, 391.1–391.3. In contrast, the Animal Inspection Service charges a flat fee (currently $32). See id. § 130.20. The purpose of the fee is to reimburse the government for the costs incurred.

Occasionally, an exporter may discover inaccuracies in an export certificate after it has been issued by a USDA inspector. There may be typographical errors or more substantive deficiencies involving matters such as the grade of beef or the destination of the product. In those instances, the inspectors' practice has been to make corrections on the original certificate themselves, authorize those corrections to be made by the exporters, or to issue a new certificate. The Food Inspection Service's regulations expressly provide for such new certificates. See id. § 322.2(c) (setting forth the requirements for "in lieu of" certificates). The Animal Inspection Service's regulations do not contain a similar provision. However, the record indicates that, in certain instances, its inspectors do issue replacement certificates when the original certificates are inaccurate. Although there is not a separate provision addressing the payment of fees for these "in lieu of" and replacement certificates, the parties do not dispute that the regulations authorize the Food Inspection Service and the Animal Inspection Service to charge fees for

5

them.

The regulations do not set forth a standard for determining when these "in lieu of" and replacement certificates are required. However, both parties have submitted affidavits—from USDA officials and a Conagra employee—agreeing that these certificates are required when the original certificate contains significant errors or omissions. See Aplt's App. vol. I, at 101 (affidavit of Dr. Mark T. Mina, Mr. Bahrani's expert, stating that new certificates are required for "major" changes); Aple's Supp. App. vol. II, at 375 (affidavit of Brad Schmeh, Conagra's expert, stating that new certificates are required in "situations where the customer needs an entirely different shipment or if the weights used for the hides are completely wrong as opposed to one digit being incorrect or transposed"); id. at 385 (affidavit of Mariana Lambert, Conagra's Letter of Credit Manager, stating that new certificates are required for "changes to the product information, which would include changes to the number of pelts or pieces, the type of hide, or the weight . . . [or] significant changes to the identification information, including entirely different container numbers or significant changes to the port of loading or port of discharge"); id., at 475 (affidavit of Dr. Claude Nelson, Conagra's expert, stating that new certificates are required when "the customer needs an entirely different shipment, or if the weights used for the hides are completely wrong or the consignee is different from on the original certificate, as opposed to one digit being incorrect or transposed"); id. at 278 (affidavit of Dr. Robert

6

Fetzner, Conagra's expert, stating that new certificates are <u>not</u> required if the changes are "minor").

**B.      Mr. Bahrani's Allegations**

From 1996 to 1998, Mr. Bahrani worked as a document coordinator at Conagra's Greeley, Colorado facility.  According to Mr. Bahrani, when Conagra employees discovered errors and omissions in export certificates, they routinely altered the original certificates or forged new certificates, rather than obtaining "in lieu of" or replacement certificates.  Based on his personal experience and information from co-workers, Mr. Bahrani maintained that Conagra employees altered more than 200 export certificates per week, and that they followed this practice at the company's Greeley facility and at other locations for at least ten years preceding the commencement of this action.  According to Mr. Bahrani, by altering the original certificates, Conagra employees avoided the fees that the company would have been required to pay for new certificates.  Thus, he asserted, he was entitled to damages under the reverse false claims provision of the False Claims Act, 31 U.S.C. § 3729(a)(7).

**C.  The False Claims Act**

Congress passed the original False Claims Act in 1863 "to combat rampant fraud in Civil War defense contracts." S. Rep. No. 99-345, at 8, <u>reprinted in</u> 1986

U.S.C.C.A.N. 5266, 5273 (1986). "The Supreme Court has given the statute an expansive reading," Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc., 190 F.3d 729, 733 (6th Cir. 1999), observing that it "covers all fraudulent attempts to cause the Government to pay out sums of money." United States v. Neifert-White Co., 390 U.S. 228, 232-33 (1968).

In order "to enhance the Government's ability to recover losses sustained as a result of fraud against the Government," S. Rep. No. 99-345, at 1 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, the Act was amended in 1986. The "growing pervasiveness of fraud necessitate[d] modernization of the Government's primary litigative tool." Id. at 2, 1986 U.S.C.C.A.N. at 5266.

Section 3729(a)(7), the reverse false claims provision at issue in this case, is one of these new "litigative tool[s]." It provides that any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person[.]

31 U.S.C. § 3729(a)(7) (emphasis added). This section was added "to provide that an individual who makes a material misrepresentation to avoid paying money owed the Government would be equally liable under the Act as if he had submitted a false claim to receive money." S. Rep. No. 99-345, at 18, 1986 U.S.C.C.A.N. at

8

5283. Section 3729(a)(7) is described as a "reverse false claims" provision "because the financial obligation that is the subject of the fraud flows in the opposite of the usual direction." United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc., 370 F. Supp. 2d 993, 998 (N.D. Cal. 2005). The provision may be enforced either by the Attorney General or by a private *qui tam* relator suing on the government's behalf. 31 U.S.C. § 3730(a), (b)(1).

Congress did not provide a definition of an "obligation" under § 3729(a)(7). However, despite the fact that "[i]n the abstract, an obligation can be legal, moral or social," see United States ex rel. S. Prawer & Co. v. Verrill & Dana, 946 F. Supp. 87, 93-94 (D. Me. 1996), courts have defined the term more narrowly. This circuit has stated that the plaintiff is required to allege that the defendant "had 'an existing legal obligation to pay or transmit money or property to the government.'" Kennard v. Constock Res. Inc., 363 F.3d 1039, 1048 (10th Cir. 2004) (quoting United States v. Pemco Aeroplex, Inc., 195 F.3d 1234, 1236-37 (11th Cir. 1999)) (emphasis added) (other internal quotation marks omitted).

There is widespread agreement that the making or using of the false record or statement is not sufficient in itself to create an obligation under § 3729(a)(7). Am. Textile Mfrs., 190 F.3d at 736 (stating that "[w]here an obligation arises if and only if a defendant makes a false statement or files a false claim . . . an action under the False Claims Act will not lie"). Instead, the obligation must arise from some independent legal duty. See id. ("[W]hatever the scope of the phrase

9

'obligation to pay or transmit money or property to the Government,' a plaintiff may not state a reverse false claim unless the pertinent obligation attached before the defendant made or used the false record or statement.") (internal citation omitted); United States v. Q Int'l Courier, Inc., 131 F.3d 770, 773 (8th Cir. 1997) ("To recover under the False Claims Act, we believe that the United States must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used."); Huangyan Imp. & Exp., 370 F. Supp.2d at 1000 (characterizing § 3729(a)(7) obligations as "existing debts" and adding that, under the Sixth Circuit's reasoning in American Textile Manufacturers, "the emphasis is not so much on the *timing* of the obligation as on its *source*" ).

Moreover, the fact that the making or using of a false statement or record might result in a fine or a penalty is insufficient to establish a § 3729(a)(7) obligation. United States ex rel. Bain v. Georgia Gulf Corp., 386 F.3d 648, 657 (5th Cir. 2004) (stating that § 3729(a)(7) "does not extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed (and as to which no formal proceedings to do so have been instituted) and which do not arise out of an economic relationship between the government and the defendant (such as a lease or a contract or the like")); Am. Textile Mfrs., 190 F.3d at 738 (stating that § 3729(a)(7) does not apply to "contingent obligations[,] includ[ing] those arising from civil and criminal

10

penalties that impose monetary fines after a finding of wrongdoing: as opposed to quasi-contractual obligations created by statute or regulation" and those that "attach only after the exercise of administrative or prosecutorial discretion, and often after a selection from a range of penalties"); Q Int'l, 131 F. 2d at 773 (stating that § 3729(a)(7) does not apply to "attempts to avoid potential fines or sanctions"); Huangyan Imp. & Exp., 370 F. Supp. 2d at 1000 (stating that "potential obligations--fines, penalties and the like--that are contingent upon the exercise of some discretion or intervening act by the government are not properly the subject of a suit under [§ 3729(a)(7)]").

There are two primary reasons why potential fines and penalties are not § 3729(a)(7) obligations. First, to apply the statute in that context would unduly broaden it. See Am. Textile Mfrs., 190 F.3d at 739 (noting the "incredible scope" of "permitting suits against any person who makes a false statement to the federal government that he did not commit a statutory or regulatory violation that might have led to the imposition of a fine, payment of liquidated damages, imposition of a tax, or forfeiture of property"). Second, the discretion vested in prosecutors and other government officials to determine whether to seek fines or penalties renders the alleged "obligation" contingent and thus beyond the reach of the statute. See Bain, 386 F.3d at 657; Am. Textile Mfrs., 190 F.3d at 739.

Q International illustrates the kind of obligation that is not encompassed by § 3729(a)(7). To take advantage of differences between domestic and

11

international postage rates, the defendant corporation transferred bulk mail from the United States to Barbados for the purpose of remailing the letters individually back into the United States (a practice known as "ABA remail"). The United States Postal Service charged Barbados's postal service as little as one-tenth of the amount that it charged for the same first-class delivery of mail within the United States.

The Eighth Circuit held that no actionable "obligation" was involved. "[T]he statutes and regulations that the United States cites might well support a judgment that one or more of the defendants engaged in illegal and fraudulent activity, but those statutes and regulations do not create a legal duty for the defendants to pay domestic postage." Q Int'l, 131 F.3d at 773.

Similarly, in American Textile Manufacturers, a national trade association alleged that a corporation had mislabeled Chinese products as coming from Hong Kong or Macau. The plaintiff contended that the mislabeling violated several statutes prohibiting the use of false documents and imposing penalties. According to the plaintiff, "each customs violation created an obligation to pay money to the government" and "the allegedly-false entry documents served to 'conceal, avoid, or decrease' the obligations." 190 F.3d at 734 (quoting § 3729(a)(7)).

In rejecting the plaintiff's assertion that, by mislabeling the goods, the defendant corporation avoided an "obligation," the Sixth Circuit first noted that the alleged obligation did not exist before the defendant made the allegedly false

12

statements.  The court also characterized the alleged violations of the statutes at issue as "[c]ontingent obligations"—those that "will arise only after the exercise of discretion by government actors." Id. at 738.  Nevertheless, the Sixth Circuit did suggest that a statute or a regulation might create a § 3729(a)(7) "obligation," "at least where the statute or regulation imposes an obligation essentially contractual in nature, such as the imposition of the requirement that those using the Postal Service pay the appropriate rate." Id. at 737-38 (internal quotation marks omitted).

In contrast to Q International and American Textile Manufacturers, United States v. Pemco Aeroplex, Inc., 195 F.3d 1234 (11th Cir. 1999) (en banc), involves an "obligation" sufficient to support a reverse false claim action.  A contract between the government and an aircraft maintenance company required the company to advise the government when it was holding property in excess of the requirements of the contract and to make appropriate arrangements to dispose of it—for example by agreeing to purchase the property or to return it to the government.  In a reverse false claims action, the government alleged that the maintenance company had submitted an inventory sheet with false information that led the government to undervalue the purchase price that the company should pay for airplane wings.  Reversing a panel decision, the en banc court held that the company had "a contractual obligation to account for the full value of any excess government property" sufficient to support a reverse false claim action under §

13

3729(a)(7).  Id. at 1237.  The fact that the parties had not agreed on a specific purchase price for the wings was not dispositive.  Id.

These decisions establish a dichotomy between "existing debts," which are covered by the statute, and "contingent penalties," which are not.  See Huangyan Imp. & Exp., 370 F. Supp. 2d at 1000.  Here, in Mr. Bahrani's reverse false claims action against Conagra, we must decide how to characterize an exporter's obtaining "in lieu of" and replacement certificates and paying the accompanying fee.

**D.  The District Court's Decision**

In granting summary judgment to Conagra, the district court concluded that the statutes and regulations invoked by Mr. Bahrani did not establish that the company was obligated to pay for "in lieu of" or replacement certificates: "None of the statutory or regulatory provisions cited in Bahrani's argument or in his supplemental filings . . . establishes that an exporter is required to obtain a replacement certificate every time a change to an existing certificate is made." Bahrani, 338 F. Supp. 2d at 1207.  Moreover, the court said, even if the regulations required Conagra to obtain new certificates when it discovered errors and omissions, "the act of altering the certificate (rather than requesting a replacement) is not an actionable reverse false claim because that obligation arises only as a result of that act and did not exist before."  Id. (citing Am. Textile Mfrs.,

14

190 F.3d at 738-39).  Finally, the fact that USDA inspectors could exercise their discretion not to require "in lieu of" or replacement certificates indicated that Conagra's "obligation" was a contingent one, and thus not covered by § 3729(a)(7).  Id. at 1207-08.

## II. DISCUSSION

On appeal, Mr. Bahrani challenges the district court's conclusion that Conagra's failure to obtain "in lieu of" and replacement certificates did not constitute an "obligation" under § 3729(a)(7).  He also argues that the district court erred by not considering one of his allegations.

Conagra defends the district court's analysis of what constitutes a § 3729(a)(7) obligation and argues in the alternative that the court's grant of summary judgment should be affirmed because (1) its employees merely corrected certificates and did not make false statements; (2) the allegedly false certificates were not presented to the government; and (3) Mr. Bahrani was not an "original source" of the allegations against Conagra.

We review the grant of summary judgment de novo.  Holt v. Grand Lake Mental Health Ctr., Inc., 443 F.3d 762, 765 (10th Cir. 2006).  Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court must examine the record to determine whether any genuine issue of

15

material fact is in dispute, and must construe the facts and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. Holt, 443 F.3d at 765. "If there is no genuine issue of material fact in dispute, we determine whether the district court correctly applied the substantive law." Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).

## A. Mr. Bahrani's Arguments

We begin with Mr. Bahrani's challenges to the district court's grant of summary judgment. He maintains that: (1) the USDA regulations require exporters to obtain new certificates and pay the accompanying fees when changes must be made after the certificates are signed; (2) by making changes to the original certificates, Conagra employees avoided an existing "obligation" under § 3729(a)(7); and (3) contrary to the district court's reasoning, the discretion vested in USDA officials does not establish that the fees for new certificates are contingent obligations outside the scope of § 3729(a)(7). Mr. Bahrani also argues that (4) the district court failed to consider his independent claim that Conagra's employees also violated § 3729(a)(7) by failing to return original certificates to the USDA when changes were necessary. We consider each argument in turn.

**1. The USDA regulations**

Mr. Bahrani first challenges the district court's conclusion that the USDA regulations do not create a § 3729(a)(7) obligation to obtain "in lieu of" or replacement certificates. He maintains that "every time Conagra alters, changes or corrects USDA export certificates it avoids paying set and established monetary fees to the government." Aplt's Br. at 47 (emphasis in original). In support of this argument, he relies on Food Inspection Service Directive 9000.1 and the affidavit of a former USDA veterinarian, Dr. Mark Mina.

According to Mr. Bahrani, Directive 9000.1 provides that "a certifying official can only initial minor erasures or alterations before signing the certificate." Id. at 42. (internal quotation marks omitted). He continues, "The certifying official has only this one opportunity to approve minor alterations after which any discretion he may have had to approve changes is forever extinguished. There are no provisions allowing the certifying official to approve and initial changes after the certificate is signed." Id. at 42-43.

Like the district court, we are not persuaded by Mr. Bahrani's reading of the Directive. The relevant sections provide:

IX. Export Certificates

    A. The certifying official receives the appropriate completed export certificate and a copy of the certified application from the exporter. The certifying official verifies that the information on the certificate is the same as the information on the application. If the certifying official has concerns about the information on the application

17

or the certificate, he or she contacts the inspection program employee who signed the application or the exporter to address any concerns.

   B.  Before signing the certificate, the certifying official:

      1.  Checks the certificate for accuracy and corrections.

      2.  Checks for attachments and lines-out any unused space.

      3.  Unless not acceptable to a foreign country, initials minor erasures or alterations . . . .

X.  Replacement Certificates

   A.  A certificate replacing an original certificate is a re-certification of the product's condition at the time of the initial export certification.  A replacement certificate for a lot does not represent the lot's current condition.   A replacement certificate may be issued in situations, such as, but not limited to:

      1.  The original certificate did not carry the required information.

      2.  The original certificate carried incorrect information.

      3.  The name of the consignee or exporter has changed.

      4.  The certificate has been lost.

   B. The replacement certificate must be dated with the same date as that shown on the original certificate.

      . . . .

Aplt's App. vol. I, at 53-54.   Although Directive 9000.1 provides a nonexclusive

list of circumstances in which new certificates may be issued, we can find no

language that establishes a standard for determining when an exporter is required

18

to obtain a replacement certificate or that bars a USDA inspector from making corrections to a certificate after it has been signed.

The other authority invoked by Mr. Bahrani—Dr. Mina's affidavit—similarly does not support the theory that new certificates are required every time a correction must be made. Dr. Mina does state that:

> Because of the need to maintain the integrity of the USDA export certificates for both animal meats and byproducts (including hides), any change, correction, or alteration made to a USDA export certificate after it has been signed by a USDA official is serious and improper. It does not matter what information is changed by a third party (non-USDA official) after the export certificate is signed, just the fact that someone other than the USDA has injected himself/herself into the documentation process creates a breach of integrity in the export documentation process. Any third party changes, including but not limited to changes to correct typographical errors, to spell out an abbreviated word, to change an address from a post office box to a street address, or to change a weight, container, or identification number where some numbers are transposed, are strictly forbidden, serious and improper.

Id. at 102-03 (emphasis added).

Nevertheless, Dr. Mina does not state that exporters are required to pay a fee every time that changes must be made to a certificate after it has been signed by a USDA inspector. Although he opines that "[n]o USDA employee has the authority to give a third party permission to make any changes to export certificates after they have been signed by USDA employees," id. at 101 (emphasis added), Dr. Mina further states that "[t]he proper procedure for making changes is to inform the certifying official (inspector or DVM) of the changes that need to be made and the certifying official will initial the change, or if the changes are major,

19

he will issue a replacement or in lieu of certificate at the request of the exporter." Id. (emphasis added). Thus, no statement from Dr. Mina indicates that the exporter is required obtain a new certificate and pay a fee when the changes are minor.

Like the district court, we therefore do not agree with Mr. Bahrani's expansive reading of the USDA statutes and regulations. "None of the . . . authorities cited in [Mr. Bahrani's] argument . . . establishes that an exporter is required to obtain a replacement certificate every time a change to an existing certificate is made." Bahrani, 338 F. Supp. 2d at 1206 (emphasis added). In particular, if a certificate requires a minor change, there is no indication that the exporter is required to obtain a new certificate and pay the accompanying fee. Although an exporter's making such minor changes to a certificate might subject it to potential fines and penalties for altering a government certificate, see 21 U.S.C. §§ 611, 676; 7 U.S.C. § 1622(h), these potential fines and penalties are not § 3729(a)(7) obligations. See Bain, 386 F.3d at 657; Am. Textile Mfrs., 190 F.3d at 738; Q Int'l, 131 F. 2d at 773; see also Aplt's Br. at 38-39 (acknowledging that the statutes that establish penalties for impermissibly altering or using altered certificates do not themselves establish § 3729(a)(7) obligations).

Nevertheless, we disagree with the conclusion drawn by the district court from its rejection of Mr. Bahrani's interpretation. The fact that new certificates are not required "every time a change to an existing certificate is made," Bahrani,

20

338 F. Supp. 2d at 1206, does not foreclose the possibility that new certificates (and the accompanying fees) are required in some instances. As we have noted, those instances are described in similar ways by a variety of witnesses. Dr. Mina states that new certificates are required when the changes are "major." See Aplt's App. vol. I, at 100. Conagra's witnesses state that new certificates are required when "the customer needs an entirely different shipment or . . . the weights used for the hides are completely wrong as opposed to one digit being incorrect or transposed[;]" Aple's Supp. App. vol. II, at 475; and when there are "changes to the product information, which would include changes to the number of pelts or pieces, the type of hide, or the weight . . . [or] significant changes to the identification information, including entirely different container numbers or significant changes to the port of loading or port of discharge[;]" id. at 385.

This agreed description of the circumstances in which the USDA requires exporters to obtain new certificates is a plausible one. It adopts a principle—materiality— that has been widely employed in various circumstances, including False Claims Act actions. See, e.g., United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 442 (6th Cir.) (holding that "false statements or conduct must be material to the false or fraudulent claim to hold a person civilly liable under the [False Claims Act]"), cert. denied, 126 S. Ct. 727 (2005); Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (stating that "[l]iability under each of the provisions of the False

21

Claims Act is subject to the further, judicially-imposed, requirement that the false statement or claim be material" and that "[m]ateriality depends on whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action") (internal quotation marks omitted).  Accordingly, although the parties may dispute whether a particular change in a particular certificate is significant enough to require issuance of an "in lieu of" or replacement certificate, we conclude from this record that there is a certain class of changes that do require such certificates.   See Excel Corp. v. United States Dep't. of Agric., 397 F.3d 1285, 1296 (10th Cir. 2005) (stating that "we must defer to both formal and informal agency interpretations of an ambiguous regulation unless those interpretations are plainly erroneous or inconsistent with the regulation") (internal quotation marks omitted).  Therefore, in examining the parties' other arguments, we consider whether Conagra's alleged failure to obtain new certificates in those instances (where there were "major" or "significant" changes) constituted the avoiding of an "obligation" under § 3729(a)(7).

## 2.   Obligations Under § 3729(a)(7)

Mr. Bahrani next challenges the district court's conclusion that, even if the USDA regulations require exporters to pay for "in lieu of" and replacement certificates (a proposition we accept to the extent that the changes are "major" or "significant"), that "obligation" is outside the scope of § 3729(a)(7).  The

22

government has filed an amicus brief in which it agrees with Mr. Bahrani's position.

According to the government, two kinds of obligations may be the subject of a reverse false claims action under § 3729(a)(7):

(1) "[t]here may be a fixed obligation, spelled out by a judgment, contract, statute, or regulation, that imposes a duty on the person to pay money or transmit property to the government. This fixed obligation may be liquidated as with a judgment, or it may be unliquidated but easily determinable[;]" Amicus Br. at 10; and

(2) there are other obligations that are "not yet 'fixed' in all particulars"; these "obligations" may be present "by virtue of the relationship between the government and the person who owes the government money or property." Id. For example, such obligations may exist "[w]hen the person and the government have a contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship." Id.

The government maintains that, accepting Mr. Bahrani's contention that the USDA regulations require exporters to pay for new certificates when the original certificates contain errors or omissions, the fees for the new certificates fall within this second category of actionable § 3729(a)(7) obligations.

In response, Conagra notes that, at the time that an exporter determines that a certificate contains errors or omissions, no payment is due the USDA. Instead,

23

payment is due only after (1) the exporter notifies the USDA of the errors and omissions that need to be changed; (2) the USDA determines that "an in lieu of" or replacement certificate is required; and (3) the USDA charges the established fee. According to Conagra, these additional stages in the process indicate that, when its employees made changes to the original export certificates, there was no "obligation" to pay the fee for "in lieu of" or replacement certificates.

Conagra also advances several policy arguments challenging Mr. Bahrani's and the government's reading of the statute. It contends that the purpose of the fees at issue is to reimburse the government for the cost of providing certification. Yet, by allegedly failing to request "in lieu of" and replacement certificates, the company did not cause the government to provide any services for which it should have been reimbursed. Because the False Claims Act was enacted to protect the government from financial losses, allowing Mr. Bahrani to pursue his claims would be inconsistent with the purpose of the statute. Moreover, Conagra concludes, to allow Mr. Bahrani to invoke the statute here would lead to an unwarranted expansion of reverse false claim actions. Absent proof of loss to the government, anyone challenging a failure to comply with a regulatory scheme could file suit.

We begin with the timing of the payment for export certificates. Like the government, we think that it is significant that § 3729(a)(7) refers to "an obligation" and not "a fixed obligation." We agree that there are instances in

24

which a party is required to pay money to the government, but, at the time the obligation arises, the sum has not been precisely determined.

The obligation addressed by the Eleventh Circuit in Pemco Aeroplex, 195 F.3d at 1237-38, provides an illustration. There, the aircraft maintenance company and the government had agreed that the government could elect to sell excess property to the company. However, at the time that the company made the allegedly false statements about the property's values, the specific amount of the company's obligation had not yet been determined. Nevertheless, "[t]hat the maintenance company offered to purchase the property and that a specific purchase price had not yet been agreed upon at the time [the company] submitted the inventory form are not the touchstone. . . . [S]ubmitting the inventory form was just part of fulfilling [an] ongoing contractual obligation." Id.; contra Q Int'l, 131 F.3d at 774 (stating that "[a] debt, and thus an obligation under the meaning of the False Claims Act, must be for a fixed sum that is immediately due").

Additionally, to require a fixed monetary obligation as a prerequisite for a reverse false claims action would be inconsistent with the broad remedial purpose of the False Claims Act. See Neifert-White, 390 U.S. 228, 233 (1968) (noting that "this remedial statute reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money"). Moreover, other provisions of the statute have been construed to allow

25

actions to proceed even though the specific amount of the claim was not yet determined at the time the false statement was made. See, e.g, Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 530 (10th Cir. 2000) (affirming a judgment for the plaintiff in a False Claim Act action under 31 U.S.C. § 3729(a)(1)-(2) that was based upon the submission of fraudulent work orders and concluding that "[s]imply because the production quantities recorded on the work orders did not determine the exact amount of the settlement does not eradicate a connection between the work orders and the [amount received by the defendant under the government contract]"). We therefore conclude that the fact that the fees for "in lieu of" and replacement certificates are not paid when the an exporter determines that the initial certificate contains errors or omissions does not foreclose recovery under § 3729(a)(7).

Although a § 3729(a)(7) "obligation" need not be for a precise amount in order to be actionable, we do agree with the district court and Conagra that the obligation must arise from a source independent of "the allegedly fraudulent acts taken to avoid it." Bahrani, 338 F. Supp. 2d at 1207. That conclusion comports with the Sixth and Eighth Circuit decisions in American. Textile Manufacturers and Q International, both of which concluded on the facts before them that no obligation existed independently of the alleged false statements themselves. See Am. Textile Mfrs., 190 F.3d at 738-41 (concluding that, under the statutes at issue, the defendant's obligations arose only after the defendant made false

26

statements and "only because the government ha[d] prohibited an act"); Q Int'l,

131 F.3d at 773 (holding that, when the defendant engaged in the challenged

practice of "ABA remail," it had no "obligation" to pay full domestic postage,

even though the practice might have violated other statutes).

However, unlike the district court, we view the alleged obligations at issue

in American Textile Manufacturers and Q International as distinguishable from

the obligation to pay fees for "in lieu of" and replacement certificates when major

or significant changes are necessary. Here, it is not Conagra employees' making

of corrections on the original export certificates that creates the obligation to pay

the fee. Instead, that obligation arises from an independent source—from the

determination that the original certificate contains a major or significant error or

omission and that an "in lieu of" or replacement certificate and payment of the

accompanying fee are necessary. It is the discovery that these changes are

necessary that creates the obligation. In our view, the circumstances are

analogous to a motorist who attempts to avoid an annual fee by unlawfully

altering the expiration date on a license plate. In that instance, it is not the

altering of the plate that generates the fee but rather an independent event—the

end of the yearly period.

As to Conagra's contention that the alleged false statements have not

resulted in a loss to the government, we note that "there is no requirement in the

text [of § 3729(a)(7)] that the Government have an ongoing interest in the funds

27

or that the Government itself suffer a loss." Kennard v. Comstock Resources, Inc., 363 F.3d 1039, 1047 (10th Cir. 2004), cert. denied, 125 S. Ct. 2957 (2005). Indeed, the legislative history of the reverse false claims provision indicates that the kind of false certification alleged by Mr. Bahrani falls within its scope:

> The cost of fraud cannot always be measured in dollars and cents, however. GAO pointed out in its 1981 report that fraud erodes public confidence in government's ability to efficiently and effectively manage its programs. Even in cases where there is no dollar loss, for example where a defense contractor certifies an untested part for quality yet there are no apparent defects–the integrity of quality requirements in procurement programs is seriously undermined.

S. Rep. No. 99-345, reprinted in 1986 U.S.C.C.A.N. 5266, 5268 (emphasis added); see also United States v. Hughes, 585 F.2d 284, 286 n.1 (7th Cir. 1978) ("A false claim is actionable under the Act even though the United States has suffered no measurable damages from the claim."); Fleming v. United States, 336 F.2d 475, 480 (10th Cir. 1964) ("Proof of damage to the Government resulting from a false claim is not part of the Government's case under the Act").

### 3. USDA Discretion

We also disagree with the district court that the discretion afforded USDA officials to determine whether to issue new certificates and charge the accompanying fees renders the obligation contingent and thus outside the scope of § 3729(a)(7). The district court based its narrow reading of the statute on

American Textile Manufacturers. and Q International.  Both cases concluded that a potential penalty that could only be assessed after a government official exercised discretion was not an actionable § 3729(a)(7) obligation.  In the Sixth Circuit's view, if such potential penalties constituted "obligations," "reverse false claims liability would attach to any person making any false statement to conceal avoid, or decrease his potential criminal liability under a law that lists among a range of penalties the imposition of a fine."  Am. Textile Mfrs., 190 F.3d at 739.  In addition to greatly expanding the scope of the False Claims Act, that interpretation would require courts to speculate as to whether in a given case, a government official would pursue an action to recover a penalty and whether such penalties would actually be assessed.  Id. at 740; see also Q Int'l, 131 F.3d at 774 (reasoning that "[a] potential penalty, on its own, does not create a common law debt").

Here, the fees for "in lieu of" and replacement certificates are best characterized as user fees; they are not penalties.  The fees must be paid in limited circumstances, and they are thus distinguishable from the general obligation to comply with statutes and regulations outside the scope of § 3729(a)(7).  See Am. Textile Mfrs., 190 F.3d at 737-38 (stating that "Congress may well have intended reverse false claims liability to extend to obligations created by statute or regulation, at least where the statute or regulation imposes an obligation essentially contractual in nature" but not deciding that question).

29

Thus, we are not convinced that an undue expansion of liability under the reverse false claims provision will follow by characterizing as an "obligation" the payment of the fees for new certificates when major or significant changes are required.

We acknowledge that there is some discretion in play here. Although the parties do not discuss the process in much detail, Conagra has submitted an affidavit from a former USDA official stating that if a certificate "needs to be changed in some way after it is issued, the inspector in charge has discretion under 9 C.F.R. § 322.2(c) to allow the exporter to make the change directly or, instead, to require the issuance of a new or replacement certificate." See Aple's Supp. App. vol. I, at 277 (affidavit of Dr. Robert Fetzner). Moreover, the official continues, "[i]f a new or replacement certificate is required, the inspector has discretion to charge a fee or not[,]" and "a fee would be charged only if the inspector determined it was necessary." Id. at 277-78.

Nevertheless, we are not convinced that this alleged discretion takes the obligation to pay the fees outside the scope of § 3729(a)(7). Some discretion inheres in a wide variety of government decisions. For example, government officials may have discretion as to whether to insist on a party's performance under a contract or whether to file a breach of contract action if a party does not perform. However, a contractual obligation falls within the scope of § 3729(a)(7). See Pemco Aeroplex, 195 F.3d at 1237 (concluding that a "specific,

30

ongoing obligation during the life of the contract" was covered by § 3729(a)(7));

Am. Textile Mfrs, 190 F.3d at 741 ("§ 3729(a)'s definition of 'obligation' certainly includes those arising from . . . breaches of government contracts").

Here, evidence submitted by both Mr. Bahrani and Conagra indicates that when export certificates required "significant" or "major" changes, the USDA required exporters to obtain "in lieu of" or replacement certificates. It was at that point—when the changes became necessary—that the obligation arose. The fact that USDA officials may have some subsequent discretion whether to actually charge the authorized fee does not mean that the "obligation" is a contingent one outside the scope of § 3729(a)(7). We therefore agree with the government that "the need for some further governmental action or some further process to liquidate an obligation does not preclude a reverse false claims action." Amicus Br. at 12 n.2; see also id. at 14 (stating that "if, as alleged by [Mr. Bahrani], the regulations did not permit such alterations [of export certificates], but required the issuance of a new certificate and payment of an additional fee, then any . . . acts of USDA officials in either waiving the fee or refusing to enforce it could not [render the fee] . . . discretionary or contingent.").

That conclusion is supported by the terms of the statute, which address "conceal[ing], reduc[ing], or avoid[ing] an obligation[,]" but do not specify the result of those efforts. Thus, in determining whether a false statement is material under § 3729(a)(7), the inquiry "focuses on the potential effect of the false

31

statement when it is made, not on the actual effect of the false statement when it is discovered." A+ Homecare, 400 F.3d at 445 (emphasis added) (internal quotation marks omitted). The fact that a government official may subsequently waive an established fee does not negate the "potential effect" of a false record or statement.

**4. Failure to Return Original Certificates**

Mr. Bahrani also maintains that the district court erred by not addressing his allegation that Conagra employees violated § 3729(a)(7) by failing to return the original certificates to the USDA after they discovered that changes were necessary. He cites a regulation that states that original certificates superseded by "in lieu of" certificates, "shall, if available, be surrendered to the inspector in charge." 9 C.F.R. § 322.2(c). By making changes on the original certificates instead of returning them, he continues, Conagra employees avoided an obligation to "transmit . . . property to the Government." 31 U.S.C. § 3729(a)(7).

We are not persuaded that the district court erred in failing to consider this theory. First, we agree with Conagra that Mr. Bahrani did not adequately advance this allegation in the district court proceedings. When the district court asked for supplemental briefing from the parties on the question of the legal basis of Conagra's "obligation" under § 3729(a)(7), Mr. Bahrani did not argue that this alleged duty to return original certificates under the USDA regulations constituted

32

an independent claim. See Rios v. Ziglar, 398 F.3d 1201, 1209 (10th Cir. 2005) (holding that the "[f]ailure to raise an issue in the district court generally constitutes waiver"). Indeed, in explaining his view of Conagra's "obligation," Mr. Bahrani even made the following statement: "If something changes which renders the original USDA certificate useless to Conagra, they can do several things. They can throw it away; shred it; put it in a file never to see the light of day, or return it to the USDA." Aplt's App. vol. II, at 370. It was not until his motion for reconsideration that Mr. Bahrani sought to advance an independent claim based on Conagra's failure to return original certificates, see id., at 422, and this eleventh-hour presentation is insufficient to preserve that claim. See Steele v. Young, 11 F.3d 1518, 1520 n.1 (10th Cir. 1993).

In any event, had Mr. Bahrani timely raised such an argument in the district court, we are not convinced that these erroneous certificates constitute the kind of "property" within the scope of § 3729(a)(7). Mr. Bahrani cites no authority to that effect, and applying the statute in this fashion would stretch it far beyond its intended purpose.

**B.  Conagra's Alternative Arguments for Affirmance**

**1.  Alleged Lack of Evidence Regarding False Statements to the Government**

Conagra maintains that the district court's grant of summary judgment should be affirmed on the alternative ground that its employees did not make false

statements to the government. In support of this contention, Conagra advances two arguments. First, it contends that because employees made corrections to the certificates, there were no false statements involved. Second, Conagra asserts, its employees lacked the intent to defraud necessary to satisfy the scienter requirements for a reverse false claims action. It maintains that "corrections to the original but inaccurate certificates were authorized." Aple's Br. at 44.

We are not persuaded by these arguments. As to the contention that Conagra's employees were correcting the export certificates, we note that it is not merely making the corrections to the certificates that may be actionable under the False Claims Act. Rather, it is the making of those corrections over the signature and certification of a USDA official who has not actually seen or approved those changes.

Conagra's alleged reliance on USDA officials to approve corrections to original certificates similarly does not establish that its employees lacked the necessary intent to violate the statute. Section 3729(a)(7) requires proof that the defendant "knowingly" made, used, or caused to be made a false record or statement to avoid an obligation. To act "knowingly" means that "a person, with respect to information--(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). "[N]o proof of specific intent to defraud is required." Id.; see also United States

34

ex rel. Aakhus v. Dyncorp, Inc., 136 F.3d 676, 682 (10th Cir. 1998) (discussing the "knowingly" requirement under § 3729(a)(7)). As we have explained, it is only the making of "major" or "significant" changes without obtaining "in lieu of" or replacement certificates that establishes an actionable obligation under the statute. Evidence in the record indicates that in some instances Conagra employees made such changes without USDA approval and thus avoided the obligation to pay a fee for "an lieu of" or replacement certificate. See Aplt's App. vol. I, at 75 (testimony from Mr. Bahrani that a Conagra employee told him that she changed the grade of beef from "no grade" to "choice"). That evidence supports Mr. Bahrani's allegation that Conagra employees had the requisite intent. Moreover, the question of whether the employees acted "knowingly" concerns their knowledge at the time they made the major changes without applying for new certificates. That USDA officials may have approved minor changes or may have even waived the fees for some major changes does not resolve the question of Conagra's employees' state of mind when the employees made the changes.

## 2. Lack of presentment to the United States

Conagra also argues that the district court's grant of summary judgment should be affirmed on another alternative ground: that even accepting Mr. Bahrani's allegations as true, Conagra employees never made any false

35

representations to the United States government (because the export certificates at issue were presented only to foreign governments).

In support of this argument, Conagra invokes a statement in Kennard v. Comstock Resources, 363 F.3d 1039, 1048 (10th Cir. 2004): that § 3729(a)(7) "squarely encompasses the fraud on the government that occurs when a person or entity makes false statements to the United States to avoid [an obligation]." (emphasis added). Conagra also cites a district court case, Wilkins v. Ohio, 885 F. Supp. 1055 (E. D. Ohio 1995), in which the court dismissed a reverse false claim action on the grounds that the plaintiff had not alleged that false information was presented to the government. The court there relied on legislative history. See id. at 1064 ("The Senate Report supports the conclusion that in order to have a 'reverse false claim,' the government has to be made aware of the false statement, misrepresentation or misleading omission in some fashion, i.e., there has to be a 'claim.'"). Conagra cites two unpublished cases that make similar statements about presentment to the government. See Aple's Br. at 46 (citing Stevens v. McGinnis, No. C-193-442, U.S. Dist. Lexis 22109 (S.D. Ohio Aug. 27, 1996) and Atkinson v. Pa. Shipbuilding Co., No. 94-7316, 2000 U.S. Dist. Lexis 12081, at *80 (E.D. Pa. Aug. 24, 2000)).

In our view, these cases do not provide much support for Conagra's argument. This circuit's statement in Kennard —that § 3729(a)(7) "squarely encompasses the fraud on the government that occurs when a person or entity

36

makes false statements <u>to the United States</u> to avoid [an obligation]," 363 F.3d at 1048 (emphasis added)—does not restrict the scope of the statute to only those instances in which statements are so made. Moreover, the district court cases invoked by Conagra are not precedential and do not concern the kind of regulatory scheme at issue here, one that involves the provision of government services in exchange for payment of a fee.

Additionally, as Mr. Bahrani argues in his reply brief, nothing in the language of § 3729(a)(7) indicates that presentment to the government is required. Other sections of the false claim statute <u>do</u> require presentment. <u>See, e.g.</u>, § 3729(a)(1) (establishing liability for one who "knowingly <u>presents, or causes to be presented</u>, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval") (emphasis added); <u>see also</u> <u>United States. ex rel. Koch v. Koch Indus.</u>, 57 F. Supp. 2d 1122, 1144 (N.D. Okla. 1999) ("The bad act under (a)(1) is the presenting of a false claim. The bad act under (a)(7) is the making or using of a false statement or record. <u>There is no "presentment" language in § 3729(a)(7).</u>") (emphasis added).

We agree that § 3729(a)(7) does not require presentment to the United States government, and Conagra is thus not entitled to summary judgment on that ground either.

37

### 3. Original source requirement as to "meat-related" claims

As a final alternative ground for affirming the district court's grant of summary judgment, Conagra contends that Mr. Bahrani is not an "original source."  Conagra limits its argument to the part of the case that concerns certificates for meat products.

Conagra's argument is based upon 31 U.S.C. § 3730(e)(4)(A) & (B), which provide:

> (4)(A) No court shall have jurisdiction over an action under this section based upon <u>the public disclosure</u> of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, <u>unless</u> the action is brought by the Attorney General or <u>the person bringing the action is an original source of the information.</u>
> (B) For purposes of this paragraph, "original source" <u>means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information</u>.

31 U.S.C. § 3730(e)(4)(A) & (B) (emphasis added).

At the summary judgment stage, application of this statutory language involves a four-part inquiry: (1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made "public" within the meaning of the False Claims Act; (3) whether the relator's complaint is "based upon" this public disclosure; and, if

38

so, (4) whether the relator qualifies as an "original source." United States ex rel. Fine v. MK-Ferguson Co., 99 F.3d 1538, 1544 (10th Cir. 1996). The burden is on Mr. Bahrani to show that he is an original source." United States ex rel Stone v. Rockwell Int'l Corp., 282 F.3d 787, 800-02 (10th Cir. 2002). However, a court should address the first three public disclosure issues first. Id. Consideration of the original source requirement is necessary only if the court answers the first three questions affirmatively. MK-Ferguson, 99 F.3d at 1544.

Here, Conagra contends, the first two elements of the original source defense are clearly established. Mr. Bahrani reported his allegations to the government in August 1999. However, prior to that time, these allegations had been publically advanced in litigation, a government investigation, and media reports.

In particular, in April 1999, in the "Kim litigation" in the Central District of California, the defendants asserted counterclaims against Conagra alleging improper alteration of meat export certificates. According to Conagra, Mr. Bahrani cooperated with the Kim defendants and their counsel, even to the point of appearing voluntarily as a witness on their behalf. These allegations were disclosed in a government investigation. The defendants in the Kim litigation provided copies of allegedly altered export certificates to the USDA, which caused the government to launch an extensive investigation into Conagra's practices. Finally, the allegations made in the Kim litigation were widely

39

published in the media.

As to the third element, whether the relator's complaint is "based upon" this public disclosure, Conagra notes that "[e]ven qui tam actions only partially based upon publically disclosed allegations or transactions may be barred." United States ex rel. Grynberg v. Praxair, Inc., 389 F.3d 1038, 1051 (10th Cir. 2004), cert denied, 125 S. Ct. 2964 (2005). "The test is whether substantial identity exists between the publically disclosed allegations or transactions and the qui tam complaint." Id. (internal quotation marks omitted). Here, Conagra contends, "Bahrani's meat-related claims closely mirror the allegations made in the Kim [l]itigation which spawned the Government's investigation and numerous media reports." Aple's Br. at 51. According to Conagra, the identical issues are addressed in this lawsuit, "namely whether the changes made to export certificates were approved by the USDA or whether Conagra was required to obtain replacement certificates." Id.

Because these first three elements are satisfied, Conagra continues, Mr. Bahrani must establish that he was an "original source." That means that (1) he must have had direct and independent knowledge of the information on which the allegations are based and (2) he must have voluntarily provided such information to the government prior to filing suit. United States ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160-61 (10th Cir. 1999).

Here, Conagra maintains, Mr. Bahrani did not have direct and independent

40

knowledge of his meat-related claims because he worked in the Hides Division at Conagra, not the Meat Products Division. Moreover, Conagra argues, Mr. Bahrani derived his knowledge from information made public from the Kim litigation in California. For example, Mr. Bahrani's Second Amended Complaint alleges that the alterations to meat export certificates began in 1991. However, he did not begin working for Conagra until 1996, and has submitted no evidence showing that he has any personal knowledge of relevant events preexisting his employment. Conagra contends that Mr. Bahrani "apparently used 1991 because it was [on] that date that the Kim defendants claimed the alleged improper practices began." Aple's Br. at 53. Also, Conagra notes, during the course of this litigation, Mr. Bahrani disclosed many documents that he had obtained from the Kim litigation.

Finally, Conagra asserts, Mr. Bahrani's knowledge of meat-related export certificates was "second-hand." Id. at 54. Mr. Bahrani did not state that he personally altered meat certificates, nor, according to Conagra, did he know the procedures related to meat certificates, or the significance of any alterations that he did observe.

Upon review of the record, we are not persuaded by this alternative argument for summary judgment. Assuming, without deciding, that Conagra has established the first three elements of the inquiry, we conclude that Mr. Bahrani has submitted sufficient evidence to support his contention that he is an original

41

source. In particular, he has offered an affidavit stating that he personally observed the alteration of export certificates while he worked for Conagra and that he heard a supervisor authorizing such changes. When viewed in the light most favorable to Mr. Bahrani—the party opposing summary judgment— these statements support his contention that he had "direct and independent knowledge of the information on which [his] allegations are based" and that this knowledge was "gained by [his] own efforts and not acquired from the labors of others." Grynberg, 389 F.3d at 1052 (internal quotation marks omitted). Additionally, Mr. Bahrani has also offered evidence indicating that he voluntarily disclosed these observations to USDA investigators in August or September 1999, before he filed this action. See Aple's Supp. App. vol. I, at 237.

Accordingly, to the extent that Mr. Bahrani's allegations are based upon personal observations that he disclosed to investigators, Conagra is not entitled to summary judgment on this issue.

### III. CONCLUSION

As applied to these circumstances, we read § 3729(a)(7) more narrowly than Mr. Bahrani but more broadly than Conagra. Like the district court, we are not persuaded that every change to a signed export certificate made by a Conagra employee creates an "obligation" under the statute. However, to the extent that Conagra employees made "major" or "significant" changes without applying for

42

"in lieu of" or replacement certificates, they avoided an obligation under § 3729(a)(7).

We emphasize that the appropriate inquiry is certificate-specific. Because of their interpretations of the regulatory scheme, both Mr. Bahrani and Conagra have advanced arguments that pertain to all changes to original export certificates, no matter how extensive. In our view, however, whether a given change to an original certificate triggers a § 3729(a)(7) obligation depends upon the nature of the change—whether it is "major" or "significant" and thus requires a new certificate. Although many of the unauthorized changes alleged by Mr. Bahrani appear to be minor, there is evidence that at least some of them fell within the "major" or "significant" class. Further development of the record is required to determine the extent to which Conagra employees made "major" or "significant" changes without obtaining "in lieu of" or replacement certificates and paying the accompanying fee.

Because Conagra's alternative arguments in support of the district court's grant of summary judgment lack merit, we therefore VACATE the district court's grant of summary judgment and REMAND for further proceedings consistent with this opinion.